

Hearing Date:  July 23, 1996
           Time:    11:00 A.M.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
WESTBURY DIVISION
--------------------------------X

In re:                         Chapter 7
                               Case No. 893-81478-20

        JAMES T. METZ
        a/k/a JAMES T. METZ JR.,

            Debtor.
--------------------------------X

### OBJECTION TO MOTION TO APPROVE STIPULATIONS

        **THE STATE OF NEW YORK**, a creditor of the above captioned
debtor, by its attorney, DENNIS C. VACCO, Attorney General of the
State of New York, submits this objection to the motion, dated July
3, 1996 and scheduled for hearing on July 23, 1996, of the Chapter
7 Trustee of the estate of James T. Metz.  The Trustee's motion
seeks approval of two stipulations resolving claims by and between
the Trustee, the Kathleen Metz Estate, Huntington & Kildare and its
related entities, and the principals of Huntington & Kildare (the
Metz family).   The State of New York is opposed to these
stipulations for the following reasons:

### PRELIMINARY STATEMENT

        1.    The State of New York objects to the proposed
stipulations of settlement because they are premature.    The
stipulations should be part of a comprehensive plan for the
reorganization of debtor, Huntington & Kildare, Inc. submitted for
creditor vote pursuant to 11 U.S.C. § 1126 and Rule 3018.
Submitted for Court approval at this time, the stipulations of
settlement constitute (a) a partial Chapter 11 plan seeking court

approval without vote of the creditors and (b) a partial substantive consolidation of the Chapter 11 case of debtor Huntington and Kildare, Inc. with the Chapter 7 case of debtor James T. Metz, Jr.    The effect of a Court approval of the stipulation would be to wipe out the $21 million claim of the State of New York against debtors Huntington and Kildare, Inc. and James T. Metz, Jr.    In an adversary proceeding filed by the State of New York against debtor Huntington & Kildare, Inc., a large portion of the State's claim involves trust funds, which are wrongly being withheld by Huntington & Kildare.    The stipulations proposed for approval would dissipate these trust funds.    A copy of the complaint in the adversary proceeding is attached as exhibit A.

## PARTIAL CONSOLIDATION

2.    The Chapter 7 Trustee of the Estate of James T. Metz, Jr. has claimed that assets of the debtor Huntington & Kildare, Inc. may belong to the James T. Metz bankruptcy estate. The salient terms of the proposed stipulation of settlement call for Huntington and Kildare, Inc. to pay the Metz Trustee $3,500,000.    The Trustee has alleged administrative and secured claims in excess of $7,500,000 against Huntington and Kildare, which under the proposed stipulation he would then release.

3.    Court approval of the stipulations means for practical purposes that the assets of Huntington and Kildare become available for distribution to the creditors of James T. Metz, Jr. Such a distribution of the assets of one bankrupt estate for the benefit of the creditors of another is the definition of a

2

consolidation (Rule 1015; COWANS BANKRUPTCY LAW and PRACTICE, 6th Ed., Vol. 1, § 3.7, p. 242)--in this instance, of a Chapter 7 debtor (Metz) with a Chapter 11 debtor (Huntington and Kildare).

4.  Neither the debtor Huntington and Kildare nor the Metz Trustee have made any showing of the numerous factors to be considered in granting a consolidation, which is akin to piercing the corporate veil.  In other cases, factors considered have included the presence or absence of consolidated financial statements, difficulty in segregating individual debtors' assets and liabilities, existence of parent or inter-corporate guarantees, unity of interests and ownership, existence of transfers of assets without corporate formalities, profitability of consolidation.

5.  Such a transfer of assets to the Metz Trustee would dilute the recoveries of the State against Huntington and Kildare, Inc. and prejudice the State's effort to obtain restitution and damages for two cooperative apartment corporations and 54 families defrauded by Huntington and Kildare.

6.  After obtaining Bankruptcy Court approval to proceed (exhibit B), the State of New York moved for summary judgment in New York State Supreme Court on January 2, 1996 against both Metz and Huntington and Kildare (State of New York v. James T. Metz, Jr. et al; New York County Index No. 94/406503).  If fully successful, the State will obtain a $21 million liquidated claim against both debtors for their coordinated frauds, as well as findings sufficient to establish an exception from bankruptcy discharge, as against James T. Metz, Jr., under 11 U.S.C. § 523.  With regard to

3

Huntington and Kildare, the State believes that its claim is timely filed and that a portion of its claim involves trust funds which are not part of Huntington and Kildare's bankruptcy estate and which are being wrongfully withheld by this debtor (see exhibit "A").

## PARTIAL CHAPTER 11 PLAN WITHOUT CREDITOR VOTE

7.    The State of New York has objected to a proposed Disclosure Statement, issued pursuant to Court order, dated June 6, 1995 in the bankruptcy of Huntington & Kildare, Inc.  The debtor repeatedly has adjourned hearing on the proposed statement.

8.    If approved by the Court, the proposed stipulations of settlement would represent, in practical effect, a Court approval of a partial plan of reorganization with substantial assets being allocated in favor of the Metz Chapter 7 Trustee. This would include trust funds, or the traceable results of the conversion of trust funds, which are not even Huntington and Kildare's property.  The Court's approval of the stipulations may mean that the Court has locked itself into a plan which grants a super-priority to the Metz Trustee to the exclusion of the State of New York and 54 families whose property the Metzes are improperly withholding.  The debtor Huntington & Kildare has an obligation to present the proposed stipulations of settlement in the context of a complete Chapter 11 plan, which should then be submitted to a vote of the creditors pursuant to 11 U.S.C. § 1126 and Rule 3018. The Trustee's motion does not change this obligation.

9.    The proffer of the stipulations of settlement at

4

this juncture, presupposes that Chapter 11 treatment will remain appropriate for Huntington & Kildare.    Its case was originally filed in the Eastern District of Connecticut.    The court's own order transferring the case (exhibit C) fairly presents a question of whether this bankruptcy case was brought in bad faith and should be dismissed.    Moreover, the Metz Chapter 7 Trustee's claim that Huntington and Kildare's assets are in reality those of the bankrupt estate of James T. Metz, argues strongly that Huntington and Kildare's case should become a Chapter 7 dissolution without the payouts envisioned in the stipulations.

10.    Debtors are seeking the Court's approvals of transfers of property which the Metzes do not even own just as the State of New York's claim is pending decision in State Supreme Court and when the State's notice of claim, although objected to by Huntington & Kildare, has not been expunged.    In the context of the Metzes many frauds, the payment by Huntington and Kildare to Kathleen Metz, James T. Metz' wife,    of $900,000, as the stipulations propose, is ludicrous.

11.    The State's motion for summary judgment pending before the Supreme Court Justice David B. Saxe should result in findings sufficient to enable the Bankruptcy Court then to determine the issues regarding the extent to which the State's claim is dischargeable and the extent to which debtor Huntington and Kildare is holding property which is not part of its bankruptcy estate.    If the State is successful in its $21 million claim, a Chapter 11 resolution of Huntington and Kildare's problems becomes

5

doubtful.

## PREMATURE SUBMISSION

12.   The submission of the proposed stipulations of settlement at this time is premature. There is no reason why the stipulations cannot be submitted as an integral part of a complete plan for the re-organization of Huntington and Kildare, Inc.  So far, Huntington and Kildare has not addressed the State's objections to its proposed Disclosure Statement. Approval of the proposed stipulations would have the effect of sidestepping this obligation as well as the other obligations raised above. Considered as part of a plan of reorganization, the proposed stipulations could better be seen in the light of debtor's complete scheme for organization, enabling a more comprehensive comment regarding both the plan and the proposed stipulation.  The Court should withhold consideration of an approval of the stipulations until that time.

## UNRELIABLE GUARANTEES IN THE PROPOSED STIPULATIONS

13.   In addition to James T. Metz and Huntington and Kildare, the State has sued other Metz family members and most of the Metz family entities named in the stipulations.   If fully successful, the State will have a $21 million judgment against these defendants. These individuals and entities will not have the assets which the debtors Huntington and Kildare and James T. Metz, Jr. envision will be available to guarantee payments under the stipulations proposed for Bankruptcy Court approval.

14.   The partial plan of reorganization reflected in the

6

proposed stipulation does not deal with consequences of the State's lawsuit which may be realized shortly.    Therefore, in addition to its other infirmities, this incomplete plan contains unreliable, possibly illusory, guarantees.

15.    A Bankruptcy Court approval of this scheme now can serve only to cloud the priority the State of New York may in the future assert against the assets of defendants in the State Supreme Court action, who have not yet filed bankruptcy petitions. Approval now would prejudice the State's interest as against other creditors claiming interests by the guarantees proposed in the stipulations, even though they had actual notice of the State's lawsuit against the Metz family and its entities.

## TRUST FUNDS

16.    A portion of the State's claim against the debtors James T. Metz, Jr. and Huntington and Kildare consists of trust funds pursuant to General Business Law, Section 352-h.    These funds are not property of the debtors' estates, but the funds of purchasers defrauded by debtors' public offerings of real estate securities.    These trust funds are the downpayments and balances of purchase prices paid by 54 families to debtor Huntington and Kildare, Inc., James T. Metz, Jr. and other Metz family members and entities for shares allocated to apartments at two cooperatives, Rockville Tudor and Maplewood Gardens.    Payment of the purchase price was usually evidenced by notes and pledges of shares, so-called "sponsor financing", now held principally by a Huntington and Kildare subsidiary, Two Lincoln Advisory Services, Inc.    This

"sponsor financing" was also never disclosed in any offering plan.

17.  General Business Law § 352-h provides in relevant part:

> Whenever hereafter any person, partnership, corporation, company, trust or association, offers or sells securities described in subdivision one of section three hundred fifty-two-e of the article in or from the state of New York, then all moneys received in connection therewith, including deposits or advances therefor, shall continue to be the money of the person making such purchase, deposit or advance, and shall be held in trust by the person, partnership, corporation, company, trust or association offering or selling such securities and shall not be commingled with the personal moneys or become an asset of the person, partnership, corporation, trust or association receiving the same, and shall not be subject to attachment, levy or other encumbrance in any action by a third party against such person, partnership, corporation, company, trust or association; and said funds shall remain in trust until actually employed in connection with the consummation of the transaction and if the transaction does not result in the acquisition of the real estate, mortgage or lease involved for any reason or reasons, then all moneys so collected less such amounts actually employed in connection with the consummation of the transaction shall be fully returned to the investors.....

Section 352-e referenced in the excerpt above requires that offerings of cooperative interests in realty be contained in an offering plan filed with the Attorney General and "not omit any material fact or contain any untrue statement of material fact."

18.  The debtors' fundamental fraud was in not describing in a duly filed offering plan all the facts material to a purchaser's decision to buy real estate securities, i.e. shares and leases in two cooperatives, Maplewood Gardens and Rockville Tudor, both in Rockville Centre, New York.  They did not disclose the desperate financial situation which they and other Metz family members and entities had placed the two cooperatives in which they

8

were selling apartments.  Huntington and Kildare publicly offered and sold shares to apartments in its own name without filing any offering plan at all.

19.   Unlike Huntington and Kildare, James T. Metz, Jr., had filed an offering plan for each of the two cooperatives, but the offers described in those plans pursuant to GBL § 352-e were never consummated.  Instead, Metz conveyed two properties subject to undisclosed tax liens and mortgages, among other problems. Maplewood Gardens became indebted by a note which was never secured by a promised mortgage and made subject to another, entirely undisclosed spreader mortgage.  Metz encumbered Rockville Tudor with a mortgage in an amount greater than promised, which he assigned to a family entity, Harding and Thornton, Inc, without disclosing Harding and Thornton's role or identity.  Huntington and Kildare participated in this fraud, and every other fraud alleged in the annexed complaint, by remaining silent when it had a duty to disclose, continuing to sell shares and committing the other acts alleged.

20.   Because of these encumbrances and other problems, detailed in the State's complaint, debtors Huntington and Kildare, Inc. and James T. Metz, Jr. never conveyed the real property or mortgages contemplated in any duly filed offering, a requirement of GBL § 352-h prior to the release of any trust funds.

21.   The trust fund statute, quoted above, provides that funds of purchasers cannot be released from trust except upon consummation of a public offering disclosed in a duly filed

9

offering plan which does not omit any material fact or make any materially false statement. The statute specifically provides that the transaction allowing for a release of trust funds must result in the acquisition of the real property and mortgages described in a filed offering plan. Since apartments were sold by offering plans with false statements, or by no offering plan at all, and did not result in the acquisition of real property or mortgages promised, the purchase amounts paid by the 54 families defrauded by the debtors, acting together with other Metz family and affiliates, remain in trust, are the property of the 54 families and are wrongfully being withheld by the debtors.

22. The debtors are fully responsible for the return of all trust funds to all 54 families because the debtors participated in concert with the other Metz family members and entities in perpetrating the frauds upon them described in the State's complaint. Since the trust is a statutory trust it does not become debtor's property or lose its character as a trust fund because debtor, together with others, has converted it unlawfully.

23. The debtors also remain fully responsible for the return of these trust funds because these funds can be traced to commercial paper held by debtors' subsidiaries and representing the balance of the purchase prices paid by most of the 54 families defrauded by debtor. This commercial paper includes pledges of shares, promissory notes, and other evidences of so-called "sponsor financing", also not disclosed in any offering plan, principally held by Two Lincoln Advisory Services, Inc., the subsidiary wholly

owned by debtor Huntington and Kildare, Inc.

**Wherefore**, the creditor, State of New York, respectfully requests that the Bankruptcy Court deny the Metz Chapter 7 Trustee's motion and grant such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         July 11, 1996

                              DENNIS C. VACCO
                              Attorney General of the
                               State of New York
                              <u>Attorney for the State of</u>
                               <u>New York</u>


                              By: _____
                                  HARVEY FELDMEIER (HF 1595)
                              Assistant Attorney General
                              120 Broadway, 23rd Floor
                              New York, New York 10271
                              Tel. No. (212) 416-8116


To:  A. Scott Mandelup, Esq.
     Pryor and Mandelup
     Attorneys for Huntington and
     Kildare, Inc.
     Debtor and Debtor in Possession
     675 Old Country Road
     Westbury, NY 11590

     Kenneth P. Silverman, Esq.
     Jaspan, Ginsberg, Schlesinger,
     Silverman and Hoffman
     Chapter 7 Bankruptcy Trustee of
     the Estate of James T. Metz, Jr.
     Attn:  Gary F. Herbst, Esq.
     300 Garden City Plaza
     Garden City, New York 11530

B250B
(1/88)

# United States Bankruptcy Court

**EASTERN** _____ District of_ **NEW YORK** _____

**In re**  HUNTINGTON and KILDARE, Inc.,

                         **Debtor**

STATE OF NEW YORK,       **Plaintiff**

HUNTINGTON and KILDARE, Inc., **Defendant**

Bankruptcy Case No.

894–86928–020
(Hon. Robert J. Hall)

Adversary Proceeding No.

**896-8279- ‰**

FRANCIS G. CONRAD JUDGE

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days.

> Address of Clerk
>         1635 Privado Road, Westbury, New York 11590

ALL DOCUMENTS REGARDING THIS MATTER MUST BE IDENTIFIED BY BOTH ADVERSARY AND BANKRUPTCY CASE NUMBERS, CHAPTER, AND NAME OF JUDGE ASSIGNED TO THE CASE.

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

> Name and Address of Plaintiff's Attorney
>         DENNIS C. VACCO, Attorney General of the
>         State of New York
>         120 Broadway, New York, New York 10271
> Attn: Harvey Feldmeier, Assistant Attorney General

If you make a motion, your time to answer is governed by Bankruptcy Rule 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

| Address | Room |
|---|---|
| U.S. BANKRUPTCY COURT | 200 |
| 1635 PRIVADO ROAD - ROOM #201 | Date and Time |
| WESTBURY, NEW YORK 11590 | 8/14/96 |
| | @ 10:00 Am |

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

                              Joseph Hurley

_6/13/96_ _____
    Date

                        _Clerk of the Bankruptcy Court_

By: _Lorraine Olsen_ _____
                             _Deputy Clerk_

U.S.B.C. – 81a

ALL DOCUMENTS REGARDING THIS MATTER MUST BE IDENTIFIED BY BOTH ADVERSARY AND BANKRUPTCY CASE NUMBERS, CHAPTER,

## CERTIFICATE OF SERVICE

I, _____, certify that I am, and at all times during the service
(name)

of process was, not less than 18 years of age and not a party to the matter concerning which service of
process was made. I further certify that the service of this summons and a copy of the complaint was made
_____ by:
(date)

☐ Mail service: Regular, first class United States mail, postage fully pre-paid, addressed to:

☐ Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

☐ Residence Service: By leaving the process with the following adult at:

☐ Publication: The defendant was served as follows: [Describe briefly]

☐ State Law: The defendant was served pursuant to the laws of the State of _____,
as follows: [Describe briefly]                                                    (name of state)

Under penalty of perjury, I declare that the foregoing is true and correct.

_____          _____
*Date*                                                          *Signature*

| Print Name | | |
|---|---|---|
| Business Address | | |
| City | State | Zip |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x

In re                              :    Ch. 11 Case No.
                                        894-86928-020
HUNTINGTON & KILDARE, Inc.,        :

                Debtor.            :
----------------------------------x

STATE OF NEW YORK,                 :

                Plaintiff,         :    Adv. Proc. No. **896-8279-** 20
                                                                    346
        - against -                :

                                        FRANCIS G. CONRAD
HUNTINGTON & KILDARE, Inc.,        :

                Defendant.         :    ALL DOCUMENTS REGARDING THIS MATTER
                                        MUST BE IDENTIFIED BY BOTH ADVERSARY
                                        AND BANKRUPTCY CASE NUMBERS, CHAPTER,
----------------------------------x     AND NAME OF JUDGE ASSIGNED TO THE CASE

### COMPLAINT FOR A PROCEEDING TO RECOVER MONEY OR PROPERTY
### AND TO DETERMINE THE VALIDITY AND EXTENT OF A CLAIM

        Plaintiff, by Dennis C. Vacco, Attorney General of the

State of New York (the "Attorney General"), alleges:

### INTRODUCTION

        1.  This is an adversary proceeding under Rule 7001(1)

and (2) of the Federal Rules of Bankruptcy Procedure brought by the

Attorney General on behalf of the State of New York for a determi-

nation that property and money obtained by the debtor in the course

of an offering and sale of cooperative interests in realty are

trust funds pursuant to New York General Business Law § 352-h and,

pursuant to 11 U.S.C. § 541(b)(1), not property of the debtor's

bankruptcy estate and that the debtor owes restitution and or

damages pursuant to Article 23-A of the New York General Business

Law and Section 63 (12) of New York Executive Law.  The details of

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

In re                                    :    Ch. 11 Case No.
                                              894-86928-020
HUNTINGTON & KILDARE, Inc.,              :

                   Debtor.               :
------------------------------------x

STATE OF NEW YORK,                       :

                   Plaintiff,            :    Adv. Proc. No.

        - against -                      :

HUNTINGTON & KILDARE, Inc.,              :

                   Defendant.            :

------------------------------------x

### COMPLAINT FOR A PROCEEDING TO RECOVER MONEY OR PROPERTY
### AND TO DETERMINE THE VALIDITY AND EXTENT OF A CLAIM

        Plaintiff, by Dennis C. Vacco, Attorney General of the
State of New York (the "Attorney General"), alleges:

### INTRODUCTION

        1.    This is an adversary proceeding under Rule 7001(1)
and (2) of the Federal Rules of Bankruptcy Procedure brought by the
Attorney General on behalf of the State of New York for a determi-
nation that property and money obtained by the debtor in the course
of an offering and sale of cooperative interests in realty are
trust funds pursuant to New York General Business Law § 352-h and,
pursuant to 11 U.S.C. § 541(b)(1), not property of the debtor's
bankruptcy estate and that the debtor owes restitution and or
damages pursuant to Article 23-A of the New York General Business
Law and Section 63 (12) of New York Executive Law.  The details of

these sales are alleged in <u>State of New York v. James T. Metz, Jr.</u> <u>et al</u>. (no. 94/406502) (the "New York Action") in the Supreme Court of the State of New York.    A copy of the Attorney General's verified complaint in the New York Action is annexed hereto as Exhibit A.

2.    The New York Action is based on, among other things, debtor's fraudulent sale of shares allocated to cooperative apartments to unsuspecting members of the public who bought apartments in buildings which were represented in writing to be financially sound, but in which, in reality, underlying and undisclosed mortgages were in default and real estate taxes were unpaid.    As a consequence of debtor's fraudulent activities, innocent members of the public stand to incur losses which the Attorney General estimates to aggregate approximately $21 million.

### JURISDICTION AND VENUE

3.    This adversary proceeding arises under the Bankruptcy Code and in the chapter 11 case of Huntington & Kildare, Inc. (Case No. 894-86928-020) pending in the Eastern District of New York. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).

4.    This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(B).

5.    Venue in this district is proper under 28 U.S.C. §1409(a).

2

## THE NEW YORK ACTION

6.    Article 23-A of the New York General Business Law
("GBL"), commonly referred to as the "Martin Act," and the
regulations issued pursuant thereto, regulate the offering and sale
of securities, including cooperative interests in realty, within
and from the State of New York.    The Martin Act proscribes
fraudulent practices in connection with the sale of securities
generally and contains provisions specifically relating to the sale
of cooperative interests in realty. The Attorney General may seek
a permanent injunction under GBL § 353 enjoining any individual or
entity who has taken part in fraudulent practices from engaging,
directly or indirectly, in the issue, sale or offer of securities
in or from the State of New York.    In addition, the Attorney
General may seek restitution pursuant to GBL § 353 for the monies
obtained from defrauded shareholders.    Pursuant to GBL § 352-h
funds collected pursuant to public offerings of cooperative
interests in realty, including offerings of leases and shares in
cooperative apartment corporations, are trust funds which remain
the property of purchasers until consummation of the transaction as
described in an offering plan required to be filed with the
Attorney General.    New York Executive Law, Section 63(12),
authorizes the Attorney General to seek injunctive relief,
restitution and damages for persistent fraudulent or illegal acts
in the conduct of business.

7.    The New York Action was commenced by the Attorney
General under the Martin Act in September, 1994 against debtor

3

Huntington & Kildare, Inc., James T. Metz, Jr., and various other Metz family members and business entities. In the New York Action, the Attorney General seeks monetary relief in the form of damages and restitution to the defrauded shareholders of the apartment corporations in the amount of approximately $21 million (the "Damage Claim").    The Attorney General also seeks injunctive relief, which is not a "debt" or "claim" that may be discharged in bankruptcy, (a) to bar permanently debtor and the other defendants from engaging in any business or actively relating to the advertisement, offer or sale of real estate securities in or from the State of New York, (b) to bar permanently debtor and the other defendants from further violating New York State's securities laws; and (c) to bar permanently  debtor and the other defendants from managing and/or controlling cooperative interests in realty. The Bankruptcy Court has authorized the continuance of the New York Action.    A copy of the Court's order is shown as exhibit "B".

8.    The New York Action is based upon the defendants' illegal and fraudulent conduct in the offer and sale of security interests and in the management of two cooperative apartment corporations known as Maplewood Gardens Apt. Corp. and Rockville Tudor Apt. Corp., both located in Rockville Centre, New York. Huntington & Kildare, Inc. and certain other defendants, including James T. Metz, Jr., offered shares and proprietary leases in these two cooperatives for sale to the public within New York State.

9.    In January 1991, James T. Metz, Jr. purported to transfer his interests in both cooperatives to debtor Huntington

4

and Kildare, Inc., a corporation nominally owned by his six children. Despite the purported transfer, James T. Metz, Jr. remained effectively in control of debtor and its public offerings. Huntington & Kildare, Inc. continued the conduct of public offerings initiated by James T. Metz, Jr. to convert the Maplewood Gardens and the Rockville Tudor properties to cooperative ownership. Huntington & Kildare did not file an offering plan, or amend offering plans for Rockville Tudor and Maplewood Gardens, earlier filed by James T. Metz. Huntington and Kildare, Inc. was required by New York General Business Law ("GBL") to disclose all the facts material to such public offerings in offering plans.

10. Debtor sold shares allocated to apartments in both cooperatives to unsuspecting members of the public within New York State when both cooperatives were in serious financial difficulty. Real property taxes, which had been represented falsely and fraudulently as having been paid, in fact had not been paid. Adding to the fraud on unsuspecting purchasers, both cooperatives were burdened with undisclosed mortgages.

11. Debtor continued not paying the taxes. The Metzes, including debtor, did not tell prospective purchasers about the cooperatives' financial problems and delayed or subverted independent audits which might have disclosed them. The failures to disclose these and other material problems in offering plans, or amendments thereto, filed with the Attorney General were frauds in violation of the Martin Act.

12.   As a consequence of the fraudulent acts of Huntington and Kildare, James T. Metz, Jr. and others, approximately 54 families unknowingly purchased shares allocated to cooperative apartments in buildings that were financially destitute.   With underlying and undisclosed mortgages in default and real estate taxes largely unpaid, the families stood to lose their entire investments in the apartments, which amounts exceeded $3 million, including bank loans and "sponsor financing" which they remain obligated to pay.   The complaint in the New York Action (which we will not duplicate here) recites in detail the numerous frauds perpetrated by Huntington & Kildare, acting in concert with other Metz family members and entities, and is incorporated herein by reference.

### HUNTINGTON AND KILDARE'S CHAPTER 11 CASE

13.   Huntington and Kildare, Inc. filed a petition for chapter 11 relief in this Court on or about May 27, 1994.

14.   Debtor neither listed nor scheduled the State of New York as a creditor on account of the debtor's Martin Act frauds despite notice in an earlier commenced formal investigation pursuant to General Business Law § 354 that debtor would be sued on such claims.

15.   Debtor has never amended its schedules to include the State of New York as a creditor on account of the New York Action. Debtor's motion to expunge the claim of the State of New York is currently before the Court.

## THE DAMAGE CLAIM IN THE NEW YORK ACTION INCLUDES TRUST
## FUNDS WHICH ARE NOT PROPERTY OF THE BANKRUPTCY ESTATE

16. The State of New York repeats and realleges each and every averment set forth in paragraphs 1-15.

17. A portion of the State's claim against the debtor is trust funds pursuant to General Business Law, Section 352-h. These funds are not property of the estate, but the funds of purchasers defrauded by debtor's public offering of real estate securities. These trust funds are the downpayments and balances of purchase prices paid by 54 families to debtor Huntington and Kildare, Inc., and other Metz family members and entities, principally James T. Metz, Jr., for shares allocated to apartments at two cooperatives, Rockville Tudor and Maplewood Gardens. Payment of the purchase price was usually evidenced by notes and pledges of shares, so-called "sponsor financing", now held by a Huntington and Kildare subsidiary, Two Lincoln Advisory Services, Inc. This "sponsor financing" was also never disclosed in any offering plan.

18. General Business Law § 352-h provides in relevant part:

> Whenever hereafter any person, partnership, corporation, company, trust or association, offers or sells securities described in subdivision one of section three hundred fifty-two-e of the article in or from the state of New York, then all moneys received in connection therewith, including deposits or advances therefor, shall continue to be the money of the person making such purchase, deposit or advance, and shall be held in trust by the person, partnership, corporation, company, trust or association offering or selling such securities and shall not be commingled with the personal moneys or become an asset of the person, partnership, corporation, trust or association receiving the same, and shall not be subject to attachment, levy or other encumbrance in any action by a third party against such person, partnership, corpora-

7

tion, company, trust or association; and said funds shall remain in trust until actually employed in connection with the consummation of the transaction and if the transaction does not result in the acquisition of the real estate, mortgage or lease involved for any reason or reasons, then all moneys so collected less such amounts actually employed in connection with the consummation of the transaction shall be fully returned to the investors.....

Section 352-e referenced in the excerpt above requires that offerings of cooperative interests in realty be contained in an offering plan filed with the Attorney General and "not omit any material fact or contain any untrue statement of material fact."

19. The debtor's fundamental fraud was in not describing in a duly filed offering plan all the facts material to a purchaser's decision to buy real estate securities, i.e. shares and leases in two cooperatives. Debtor did not disclose the desperate financial situation which debtor, together with James T. Metz, Jr. and other Metz family members and entities, had placed the two cooperatives in which they were selling apartments. The debtor publicly offered and sold shares to apartments in its own name without filing any offering plan at all.

20. Unlike debtor, its predecessor and co-actor in these frauds, James T. Metz, Jr., filed an offering plan for each of the two cooperatives, Maplewood Gardens and Rockville Tudor, but the offers described in those plans pursuant to GBL § 352-e were never consummated. Instead, Metz conveyed two properties subject to undisclosed tax liens and mortgages, among other problems. Maplewood Gardens became indebted by a note which was never secured by a promised mortgage and made subject to another, entirely

8

undisclosed spreader mortgage.    Metz encumbered Rockville Tudor with a mortgage in an amount greater than promised, which he assigned to a family entity, Harding and Thornton, Inc, without disclosing Harding and Thornton's role or identity.  Huntington and Kildare participated in this fraud, and every other fraud alleged in the annexed complaint, by remaining silent when it had a duty to disclose, continuing to sell shares and committing the other acts alleged.

22.    Because of these encumbrances and other problems, including its own failure ever to file any offering plan, debtor Huntington and Kildare, Inc. and its predecessor, James T. Metz, Jr., never conveyed the real property or mortgages contemplated in any duly filed offering, a requirement of GBL § 352-h prior to the release of any trust funds.

23.    The trust fund statute provides that funds of purchasers cannot be released from trust except upon consummation of a public offering disclosed in a duly filed offering plan which does not omit any material fact or make any materially false statement.  The statute specifically provides that the transaction allowing for a release of trust funds must result in the acquisition of the real property and mortgages described in a filed offering plan.  Since apartments were sold by offering plans with false statements, or by no offering plan at all, and did not result in the acquisition of real property or mortgages promised, the purchase amounts paid by the 54 families defrauded by debtor,

9

acting together with the Metz family, remain in trust and are not debtor's property.

22. The debtor is fully responsible for the return of all trust funds to all 54 families because the debtor acted in concert with other Metz family members and entities in perpetrating the frauds upon them described in the State's complaint. Since the trust is a statutory trust it does not become debtor's property or lose its character as a trust fund because debtor, together with others, has converted it unlawfully.

23. The debtor remains fully responsible for the return of these trust funds because these funds can be traced to commercial paper held by debtor's subsidiary and representing the balance of the purchase prices paid by most of the 54 families defrauded by debtor. This commercial paper includes pledges of shares, promissory notes, and other evidences of so-called "sponsor financing", also not disclosed in any offering plan, held by Two Lincoln Advisory Services, Inc. Two Lincoln's shares are wholly by Huntington and Kildare, Inc.

24. Accordingly, the State of New York seeks a determination that all the money for apartments in the Rockville Tudor and Maplewood Gardens cooperatives obtained by debtor, members of the Metz family and others with whom the debtor acted in concert is not property of the debtor's bankruptcy estate and that these funds and all the property to which these trust funds can be traced is the property of the purchasers of these apartments and immediately returnable to them.

WHEREFORE, the State of New York requests that the Court enter a judgment (1) awarding the Damage Claim asserted in the New York Action against Huntington and Kildare, Inc. in the amount of $21,126,236, (2) determining that the downpayments and purchase prices paid to debtor or any of its co-defendants in the New York action by purchasers of apartments in the Rockville Tudor and Maplewood Gardens cooperatives are trust funds pursuant to New York General Business Law § 352-h and not property of the debtor's bankruptcy estate, (3) directing an accounting of such trust funds and of any property, including all evidences of debt or "sponsor financing", together with the income therefrom, derived or traceable from the dispersion of such trust funds, (4) directing a return to such purchasers of such funds and property and granting such other and further relief as is just and proper.

Dated:   New York, New York
         June 7, 1996

                              DENNIS C. VACCO
                              ATTORNEY GENERAL OF THE
                               STATE OF NEW YORK
                              Attorney for Creditor,
                               State of New York

                         By: 

                              HARVEY FELDMEIER
                              Assistant Attorney General
                              120 Broadway
                              New York, New York 10271
                              (212) 416-8116

OF COUNSEL:
Gary R. Connor
Assistant Attorney General
State of New York

11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------X

STATE OF NEW YORK,                          :

                        Plaintiff,          :

            -against-                       :        **VERIFIED COMPLAINT**

JAMES T. METZ, JR., DOUGLAS C. METZ,        :        Index No. 94-406503
MAPLEWOOD GARDENS REALTY, ALICIA H.
METZ, LAWRENCE McGOWAN, KATHRYN METZ,       :
LAUREN METZ SIMON, JAMES T. METZ, III,
ROBERT METZ, MARGARET METZ, THE             :
BECHTOLDT CORPORATION, HUNTINGTON and
KILDARE, INC., PETERSON PETROLEUM OF        :
NEW HAMPSHIRE, INC., TWO LINCOLN
ADVISORY  SERVICES, HARDING & THORNTON,     :
INC., COBBLE POND FARMS, INC.,
and HOWARD BODNER,                          :

                        Defendants.         :

-----------------------------------------X

Plaintiff, by G. Oliver Koppell, Attorney General of the State of New York, complaining of the defendants, alleges the following upon information and belief:

## INTRODUCTION

1. This action is brought on behalf of the State of New York by Attorney General G. Oliver Koppell, pursuant to his authority under Article 23-A of the General Business Law (the "Martin Act") and Section 63(12) of the Executive Law.

2. By this action the Attorney General seeks (a) to permanently enjoin the defendants from engaging in any business or activity relating to the advertisement, offer or sale of real

estate securities in or from the State of New York, and (b) damages and restitution as permitted by law.[1]

## PRELIMINARY STATEMENT

3.    This action is based upon defendants' illegal and fraudulent conduct in the offer and sale of security interests and in the management of two cooperative apartment corporations known as Maplewood Gardens Apt. Corp., located at 120, 124 and 130 So. Park Ave. and 111 So. Centre Ave., and Rockville Tudor Apt. Corp., located at 12 Hempstead Avenue. Both cooperatives are in Rockville Centre, New York.

4.    In particular, in the offering plans and amendments filed with the Department of Law, the sponsor-defendants gave materially false information about the mortgages affecting both cooperatives and failed to disclose other financial irregularities, including their own failures to pay maintenance and real property taxes.

5.    According to the offering plan submitted to the Attorney General regarding the Maplewood Gardens cooperative, the sponsor, Maplewood Gardens Realty, took back a purchase money mortgage on the premises when it transferred title to the apartment corporation in September 1989.  Since that time, the sponsor has collected monthly mortgage payments from the cooperative.  In fact,

---

[1]    If a money judgment is obtained against a bankrupt defendant, permission of the Bankruptcy Court will be sought before the judgment is enforced.

however, the sponsor does not hold a purchase money mortgage on the premises, and never did.

6.    In addition, the sponsor-defendants failed to disclose the existence of a mortgage on the Maplewood premises that was held by Connecticut National Bank.    That mortgage encumbered the premises when title was transferred to the apartment corporation in September 1989, and still exists.

7.    According to the offering plan submitted with regard to Rockville Tudor Apt. Corp., sponsor James T. Metz, Jr. promised a $1,990,000 mortgage, held by the Troy Savings Bank.    He then declared his plan effective and closed, taking purchasers' final payments. In a subsequently filed, amended offering plan, Mr. Metz stated the mortgage was really for $2,056,536.18 in principal and was held by the Bank of New York.

8.    In fact, the holder of the mortgage was a Metz family entity, defendant Harding & Thornton, and the Bank of New York held only a collateral interest in the mortgage.    Mr. Metz had no authority to increase the principal amount of the mortgage by $66,536.18, as he did, nor to use the resulting Harding and Thornton mortgage as collateral for a loan from the Bank of New York.

9.    This action is also based on the sponsor-defendants' ongoing failure to meet their maintenance obligations to both apartment corporations in accordance with their representations that they would do so, set forth in the offering plans.    Further, the sponsor-defendants engaged in sales activity without filing required amendments for either cooperative and did not disclose

3

materially adverse financial changes, including defaults in the underlying mortgages and real property taxes, defendants' failure to pay maintenance, and the fact that unsold shares had been pledged to a bank. Nor did defendants identify in filed offering plans their true roles and true relationships to their public offerings and the true identities of principals and family entities actually offering shares and proprietary leases for sale to the public within and from New York State.

### The Defendants

10.    Defendant Maplewood Gardens Realty is the sponsor of the plan to convert the premises at 120, 124 and 130 So. Park Avenue to cooperative ownership. At the time of the offering, its offices were located at 34 West Columbia Street, Hempstead, New York.

11.    Defendant James T. Metz, Jr. was a general partner of Maplewood Gardens Realty as was his brother, Douglas Craig Metz. James T. Metz, Jr. is also the sponsor of an offering plan for Rockville Tudor Apt. Corp. (Maplewood Gardens Realty, James T. Metz, Jr. and Douglas Craig Metz are referred to collectively as the "sponsor-defendants"). James T. Metz, Jr. is the father of individual defendants Alicia H. Metz, Kathryn Metz, Lauren Metz Simon, Robert Metz, James T. Metz, III, and Margaret Metz.

12.    The Bechtoldt Corporation was the managing agent of the apartment corporations herein, Maplewood Gardens Apt. Corp. and Rockville Tudor Apt. Corp. Bechtoldt managed Maplewood until late 1993 and Rockville Tudor until Spring 1994. At the time of

4

the conversions, James T. Metz was the sole owner of Bechtoldt; now the principals of Bechtoldt Corporation are Alicia Metz and her sister, Kathyrn. Douglas Metz was the president of Bechtoldt from September 1989 to early 1990; he was succeeded by Lawrence McGowan (James Metz Jr.'s brother-in-law), from early 1990 through late 1991, and then by Alicia Metz.

13. Defendant Huntington and Kildare, Inc. ("H&K"), a corporation owned by James Metz Jr.'s six children, is or was the majority shareholder of both apartment corporations during certain periods after the conversions. In 1991, H&K purportedly "purchased" more than 80% of the unsold shares in Maplewood Gardens Apt. Corp. from sponsor, Maplewood Gardens Realty, and all of the unsold shares of Rockville Tudor Apt. Corp. from sponsor, James T. Metz, Jr. (Whether actual value was transferred for the shares is in question). The remaining unsold shares in Maplewood are held by other Metz entities: Two Lincoln Advisory Services, Peterson Petroleum of New Hampshire, Inc., and Mitchelltown Apartments.

14. Two Lincoln Advisory Services is wholly owned by H & K and is the offeror and holder of financing instruments for the sale of cooperative apartments by other defendants.

15. Peterson Petroleum of New Hampshire is a fuel distributor that is partially owned by H & K and is controlled by the Metz family. Together with H & K, Peterson was the holder of contracts to provide fuel to the apartment corporations at issue.

16. Harding & Thornton, Inc. is a mortgage company wholly owned by James T. Metz, Jr. and was the holder of an

5

undisclosed mortgage encumbering the building owned by Rockville Tudor Apt. Corp.

17.    Defendant Howard Bodner was counsel to the sponsors in connection with the offering plans and conversions of Maplewood Gardens Apt. Corp. and Rockville Tudor Apt. Corp. He was also the attorney for both cooperatives from inception to March 1992.

18.    Defendant Alicia H. Metz is a director of Bechtoldt Corporation, H&K, Two Lincoln Advisory Services, and Rockville Tudor Apt. Corp. She is president of H&K and the Bechtoldt Corporation and, until April 1994, was president of Rockville Tudor Apt. Corp. She was also a director and president of Maplewood Gardens Apt. Corp. until mid-1993.

19.    Defendant Lauren Metz Simon is an officer and director of H&K. Until June 1994, she was a director of the Rockville Tudor Apt. Corp. She works for the Bechtoldt Corporation and is or was a director and officer of Rockville Tudor Apt. Corp. and Maplewood Gardens Apt. Corp.

20.    Defendant Kathryn Metz is a director of H&K and Rockville Tudor Apt. Corp. She is an officer of H&K and the Bechtoldt Corporation and is or was a director and officer of Rockville Tudor Apt. Corp. and Maplewood Gardens Apt. Corp.

21.    Defendants James T. Metz, III,  Robert Metz and Margaret Metz are directors and shareholders of Huntington and Kildare, Inc. and fiduciaries in H & K's public offering of shares and proprietary leases in Rockville Tudor Apt. Corp. and Maplewood Gardens Apt. Corp.

6

22.    Defendant Cobble Pond Farms, Inc. is the owner of the Metz family farm and residence on Mitchell Town Road in Sharon, Connecticut and a chain of convenience stores.    Its shares are owned by defendant Huntington and Kildare, Inc.    It is the recipient of unlawful transfers of money and property belonging to the two cooperative apartment corporations herein and an instrumentality for the holding and transfer of assets controlled by the Metz family.

## Statutory Framework

23.    Article 23-A of the General Business Law ("GBL"), commonly referred to as the "Martin Act," and the regulations issued pursuant thereto regulate the offering and sale of securities, including cooperative interests in realty, within and from the State of New York.

24.    The Martin Act proscribes fraudulent practices in connection with the sale of securities generally, and contains provisions specifically relating to the sale of cooperative interests in realty.    Provisions relevant to this action include the following:

a.    GBL § 352(1) outlaws fraud and fraudulent practices, provides, inter alia, that any violation of any section of Article 23-A of the GBL is a fraudulent practice, and authorizes the Attorney General to investigate such allegations.

b.    GBL § 352 also provides that any "deception, misrepresentation, concealment, suppression, fraud, false pretense, or false promise..." by any person, partnership or corpora-

7

tion, in the sale of securities in or from the State of New York, constitutes a fraudulent practice.

c.   GBL § 352-c provides that it shall be illegal and prohibited for any person or partnership ... to use or employ the following acts or practices:

> (1)   Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (2)   Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (3)   Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution ... or purchase within or from this state of any securities... as defined in Section 352 of this article...

d.   GBL § 352-e makes it illegal for a sponsor to omit any material fact in an offering plan required to be filed by the Department of Law or in any subsequent amendment to the plan.

25.   The GBL authorizes the Attorney General to promulgate regulations to carry out the provisions of the statute. Pursuant to GBL § 352-e(6)(a), the Attorney General promulgated 13

8

NYCRR Part 18, the regulations applicable to the conversion of occupied rental buildings to cooperative ownership.

26. 13 NYCRR 18.4(b) requires sponsors to submit a certification, under penalty of perjury, that the sponsors have investigated the facts in the offering plan and the underlying facts, have exercised due diligence to form a basis for the certification, and that documents submitted by the sponsors which amend or supplement the offering plan will:

> (1) set forth the detailed terms of the transaction and be complete, current and accurate;
>
> (2) afford potential investors, purchasers and participants an adequate basis upon which to found their judgment;
>
> (3) not omit any material fact;
>
> (4) not contain any untrue statement of a material fact;
>
> (5) not contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (6) not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances; and
>
> (7) not contain any representation or statement which is false, where they: (i) knew the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort to ascertain the truth, or (iv) did not have knowledge concerning the representations or statements made.

27.   13 NYCRR 18.5(c)(1) provides, in pertinent part, that all amendments which extend the term of the offering plan "must disclose all material changes... ."

28.   13 NYCRR 18.3(gg)(i) provides that material facts concerning the sponsor, including lawsuits materially affecting the offering, must be disclosed.

29.   13 NYCRR 18.2(c)(4)(d) (D-4) requires a sponsor for the conversion of occupied premises to cooperative ownership to file with the Department of Law an affidavit stating, _inter alia_, that its net worth is sufficient to meet "all of the unsecured obligations sponsor assumes in the offering plan including sponsor's obligations for unsold shares."

30.   13 NYCRR 18.3(w) requires sponsors to pay maintenance obligations on their unsold units to the apartment corporations.

31.   The Attorney General may seek a permanent injunction under GBL § 353, enjoining any individual or entity who has taken part in fraudulent practices, from directly or indirectly engaging in the issue, sale or offer of securities within or from the State of New York.  In addition, the Attorney General may seek restitution pursuant to GBL § 353(3).

32.   Executive Law Section 63(12) applies to acts or conduct which constitute repeated or persistent fraudulent or illegal acts in the conduct of business.  This provision authorizes the Attorney General to seek an injunction to enjoin such acts or conduct and to seek restitution and damages.

10

## STATEMENT OF FACTS

### FACTS WITH REGARD TO MAPLEWOOD GARDENS

33.    On or about October 29, 1987, defendant Maplewood
Gardens Realty submitted to the Department of Law a proposed
offering plan to convert the 107-unit complex known as Maplewood
Gardens, in Rockville Centre, New York, to cooperative ownership.
The complex is located at 120, 124 and 130 South Park Avenue and
111 South Centre Avenue, Rockville, Centre.

34.    The plan was accepted for filing by the Department
of Law on July 14, 1988.

35.    Submitted with the offering plan was a certifica-
tion by the principals of the sponsor, James T. Metz, Jr. and
Douglas Craig Metz, affirming that the plan was accurate and did
not, and would not in the future, contain any untrue facts or omit
any material facts.

36.    The plan was subsequently amended; the first amend-
ment was accepted on August 5, 1988, the second amendment on
November 4, 1988; the third amendment on May 8, 1989; the fourth
amendment on August 23, 1989; the fifth amendment on November 2,
1989; and the sixth amendment on June 26, 1990.

### FALSE MORTGAGE INFORMATION
### IN OFFERING PLAN AND AMENDMENTS

37.    According to the offering plan, two mortgages would
be in place when title was transferred to the apartment corpora-
tion.    The first mortgage, held by The Troy Savings Bank and then

11

by the Federal Home Loan Mortgage Corporation ("Freddie Mac"), had an original principal amount of $2 million, an interest rate of 12.045%, and required monthly payments of slightly more than $20,600. In addition, the sponsor was to take back a purchase money mortgage of $1.5 million, with an interest rate of 9%, requiring monthly payments of about $12,000.

38.    Contrary to the representation in the plan, the sponsor did not take back a purchase money mortgage of $1,500,000. No such mortgage was ever executed, recorded or filed with the county clerk.

39.    Sponsor did, however, cause an unsecured note in the amount of $1,500,000 to be executed at the closing on September 5, 1989, with Alicia Metz signing on behalf of the apartment corporation. That note was not then and has never since been secured by the apartment corporation's property. Consequently interest payments on this note are not tax deductible to tenant-shareholders as promised in the prospectus.

40.    At the time of closing there was an outstanding note and second mortgage lien against the property held by Connecticut National Bank ("CNB") originally executed by James T. Metz, Jr. and Douglas Metz (and a third person) on February 28, 1988.    That lien, a "spreader" mortgage in the amount of $1,500,000, encumbering several different properties held by Metz family entities, was not disclosed in the offering plan, nor in any of the subsequent amendments to the plan.    It remains an unsatisfied lien against the property to date.

12

41.    Though both the first and second mortgages provided that the mortgagee's permission was required for the mortgagor to transfer title, James T. Metz, Jr. effected the conversion to cooperative ownership and title transfer to the apartment corporation without disclosing this requirement in the offering plan and without obtaining the requisite permission from either the first or second mortgagee.

42.    From the closing in September 1989 through 1993, defendant Bechtoldt Corporation, the Metz-owned and operated managing agent for the premises, made regular monthly payments of $12,000 from the apartment corporation's funds on the unsecured sponsor-held note.

43.    The sponsor, however, was not making payments on the undisclosed CNB mortgage which was in default as of December 31, 1991. No payments had been made on that mortgage since October 1990, placing the apartment corporation in jeopardy of a foreclosure, of which non-sponsor affiliated shareholders and prospective purchasers were unaware.

44.    Neither the existence of the CNB mortgage nor the non-payments by sponsor were disclosed in the two amendments filed after closing -- the fifth in November, 1989 and the sixth in June, 1990. Yet the sponsor continued to engage in sales activity during that period.

**SPONSOR MAINTENANCE ARREARAGES**

45.    After title to the premises was transferred from the sponsor to the apartment corporation in September 1989, the sponsor-defendants continued to own a considerable number of unsold units, many of which were occupied and generated rental income to the sponsor.

46.    The apartment corporation depends on receipt of maintenance payments from the owners of all units, including the sponsor-defendants, in order to carry out day-to-day operations and meet financial obligations. Pursuant to an offering plan, the sponsor is obligated to pay the required maintenance on all units that have not been sold and that the sponsor continues to own.

47.    By December 31, 1989, barely four months after closing, sponsor had accumulated more than $174,000 in maintenance arrearages on the unsold shares it held in the apartment corporation. The unsold shares remained in arrears throughout 1990, 1991 and 1992, leaving accumulated year-end arrearages of $94,000, $95,700 and $157,600 respectively.

48.    Yet these arrearages were never disclosed to prospective purchasers and were not made known to other shareholders until 1992, when the corporation's 1989 and 1990 certified financials were finally distributed.

49.    In June, 1990, in response to regulations promulgated by the Department of Law, the sponsor filed a sixth "financial disclosure" amendment.    That amendment stated that "the sponsor is current with respect to its obligations to the apart-

14

ment corporation and has been current since title was transferred to the apartment corporation on September 6, 1989". That representation was false.

50. A sponsor's failure or inability to pay maintenance is a material fact that must be disclosed in a filed amendment before the sponsor can offer or sell the unsold units. Here, there were no disclosures of the sponsor's extended and extensive maintenance shortfalls, but the sponsor-defendants continued to engage in sales activity.

## UNDISCLOSED TAX ARREARAGES

51. At the closing on September 6, 1989, back school taxes on the property were not paid by the sponsor and became an obligation of the apartment corporation, contrary to the terms of the plan, at p. 62, which provides that real estate taxes will be apportioned between the apartment corporation and the sponsor at closing.

52. Because the taxes were not paid at closing, the first mortgagee, in December, 1989, used the apartment corporation's tax escrow to pay pre-closing taxes which were the sponsor's responsibility. (Since the first mortgagee was never advised of the conversion and closing by sponsor, it was not present at the closing).

53. Neither the offering plan nor the first five amendments disclosed the tax arrearages on the property, nor did the sixth amendment disclose the invasion of the apartment's tax

15

escrow to pay sponsor's back taxes, material facts that pros-
pective purchasers were entitled to know.

54. Also undisclosed was the default in the first
mortgage note due to failure to make the required monthly debt
service and real estate tax escrow payments. In 1991, Freddie Mac
advanced more than $233,000 to cover delinquent real estate taxes,
water charges and penalties and filed a lis pendens indicating
that a foreclosure proceeding would be instituted unless the
defaults were cured. Those facts were not revealed in any amend-
ment to the plan.

## SPONSOR'S NON-DISCLOSURE TO THE
## APARTMENT CORPORATION'S ACCOUNTANTS

55. In late 1990, James T. Metz, Jr. retained the
accounting firm of Shallo & Galluscio to prepare certified finan-
cial statements for the Maplewood Gardens Apartment Corporation.
A representative of the firm commenced work on the 1989 and 1990
financial statements after April 1991.

56. Alicia Metz and James T. Metz, Jr. were the princi-
pal contacts from the apartment corporation, providing financial
data and confirmations of information to the accountant, Robert
Galluscio. Neither disclosed the existence of the CNB second
mortgage to Mr. Galluscio nor that the sponsor's "mortgage" was
really an unsecured note. Consequently, the certified financial
statements for 1989 and 1990, report the existence of a $1,500,000
mortgage payable to the sponsor, placed on the property at clos-

16

ing, with a principal balance of $1,487,953 as of December 31, 1990. There is no reference to a CNB mortgage.

57. Alicia Metz and James T. Metz, Jr. are responsible for this material false statement and material omission in the certified financial statement.

58. Mr. Galluscio was informed by Alicia Metz that in 1990 the apartment corporation had borrowed $109,500 from Troy Savings Bank in order to pay real estate taxes. Mr. Galluscio requested evidence of a Board resolution authorizing such loan, but was never provided with any.

59. In fact, there was no such loan between the apartment corporation and Troy Savings Bank, but simply the fiat of Alicia Metz and James T. Metz, Jr. imposing an arbitrary obligation on the apartment corporation without the semblance of legitimate corporate authorization. The 1990 loan from Troy Savings Bank was in fact an obligation of James T. Metz, Jr. and not the apartment corporation.

60. As part of the 1989 and 1990 certified financial statements, Mr. Galluscio prepared an auditor's management report indicating various problems with cash flow and uncollected maintenance fees. The reports expressed concern as to the ongoing viability of the cooperative, if changes, such as aggressive efforts to collect maintenance arrearages, were not made.

61. The management reports prepared by the apartment corporation's accountant, however, were not distributed to the shareholders by the Bechtoldt Corporation, Alicia Metz or James T.

17

Metz, Jr. Only after the reports were provided to the Department of Law in January, 1994 did non-sponsor affiliated shareholders learn of their contents.

62. James T. Metz, Jr. terminated Shallo & Galluscio as the apartment corporation's accountants in late January, 1992.

63. In January, 1992, Alicia Metz retained Bruce Sobol to act as the accountant for Maplewood Gardens Apartment Corp.

64. With Mr. Sobol, the Metz's pattern of concealment or outright dishonesty regarding the financial circumstances of the apartment corporation continued.

65. As per standard auditing practice, Mr. Sobol sought various written confirmations regarding obligations of the apartment corporation. In a January 18, 1993 letter signed by Lauren Metz Simon, the existence of a $1,476,000 loan, secured by a second mortgage, payable to Two Lincoln Advisory Services, Inc., as successor to the sponsor, Maplewood Gardens Realty, was confirmed. Ms. Simon, the daughter of James T. Metz, Jr. and sister of Alicia Metz, signed this false statement as Vice President of Two Lincoln Advisory.

66. Mr. Sobol, however, had obtained a title report on the property, which revealed a $1,500,000 mortgage lien held by Connecticut National Bank, executed on February 25, 1988 by James T. Metz, Jr., Douglas Craig Metz and a third person.

67. When Mr. Sobol attempted to confirm the existence and status of the CNB second mortgage, he was unceremoniously halted by James T. Metz, Jr.

68. In a note to the 1991 and 1992 certified financial statement, the accountant states:

> The Sponsor's report of the closing states that the Sponsor agreed to make all of the payments due CNB in connection with this note and mortgage. Due to a scope limitation placed on the auditor, the following could not be confirmed with either CNB or the Sponsor: the terms and status of the note and mortgage which CNB holds, whether any defaults have occurred and if there are any defaults, whether CNB has taken any steps to enforce its rights under the mortgage which might have an adverse affect on the Corporation.

69. Thus, sponsor's failure to disclose the existence, status and terms of the CNB mortgage was not simply an oversight or inadvertence. Lauren Metz Simon falsely represented that the sponsor's note was secured by the apartment corporation's property and James T. Metz, Jr. aggressively sought to conceal every bit of information about the CNB mortgage.

70. The defendants then constructed two levels of concealment and obfuscation. They directly misrepresented or omitted material facts themselves; and they caused the certified financial statements, which must be provided to shareholders pursuant to the plan, to be false and misleading.

## NON-DISCLOSURE OF MAJOR ROOF DEFECTS

71. The roof at the premises has been plagued with leaks and other serious problems that persist to this day. Numerous violations have been issued and remain unattended. Extensive and costly repairs are needed. From the outset, the sponsor has

19

misrepresented the condition of the roof and failed to disclose litigation initiated by a roofer who contracted to do repairs to the roof.

72.    The offering plan represented that existing pro-blems with the roofs would be corrected: "Sponsor has said all roof areas will be redone and reflashed."  To date however, seven years later, the problems have not been cured.

73.    Apparently a roofer was engaged by the sponsor but was not paid for work performed.  On November 18, 1988, after the plan was accepted but before it was declared effective, the roof-ing company sued the sponsor for nonpayment of more than $100,000. That lawsuit, which was not resolved for nearly two years, was never disclosed to prospective purchasers in any amendment to the plan.

74.    There was also no disclosure of the continuing deterioration of the roof.  In October 1990, a stipulation of set-tlement between the roofer and the sponsor acknowledged the da-maged status of the roof, the need "to repair leaks and apply masonry restoration to six previously specified areas of the premises" and the necessity for other remedial work to make the roof area free of leaks.  Yet none of the amendments -- from the first filed on August 5, 1988, to the sixth (and last) filed on June 26, 1990 -- makes any reference to the problems with the roof.

75.    Under Bechtoldt's management, conditions worsened. Summonses and letters from the Rockville Centre Building Depart-

20

ment document the continuing deterioration of the premises and Bechtoldt's lack of response.

## FACTS WITH REGARD TO ROCKVILLE TUDOR

76. On October 29, 1987, defendant James T. Metz, Jr. submitted a proposed offering plan for the cooperative conversion of the premises at 12 Hempstead Avenue in Rockville Centre, New York, as the Rockville Tudor Apt. Corp. The building at 12 Hempstead Avenue is a residential apartment building with 84 apartments, six of which are basement apartments, to which the sponsor reserved the right to allocate shares and proprietary leases.

77. With his proposed plan, defendant James T. Metz submitted an affidavit of net worth stating that his net worth was greater than that required to satisfy his obligations under the plan and all obligations with respect to unsold shares. He also certified that he had read his proposed plan and investigated the facts and that his plan did not omit any material facts, contained no untrue statements of material fact, and did not contain any fraud or deception or any promise beyond reasonable expectation. He further certified that future amendments to the plan submitted by him would be similarly truthful.

78. The Attorney General accepted James T. Metz, Jr.'s plan, offering shares and proprietary leases in the Rockville Tudor Apt. Corp., for filing on November 21, 1988. The plan stated that Rockville Tudor Apt. Corp. would own the building at 12 Hempstead Avenue subject to a first mortgage held by the Troy Savings Bank

21

in the principal amount of $1,990,000.    It also stated that at closing and conversion to cooperative status, defendant James T. Metz, Jr. would apportion real estate taxes and water and sewer charges.    A contract of sale submitted as an exhibit with the offering plan provided that any unpaid real property taxes would be paid within two days of closing.

79.    Defendants Bechtoldt Corporation, Douglas Metz, Alicia H. Metz and Lawrence McGowan were the selling agents for James T. Metz, Jr. of the shares and proprietary leases he was offering in his plan.

80.    Defendant James T. Metz, Jr. declared the plan effective as a "non-eviction" plan on June 2, 1989, based on subscriptions for 17 apartments.    At the closing with the apartment corporation on November 17, 1989, Mr. Metz took title to the unsold shares and proprietary leases to 73 apartments, including shares he had allocated to six basements apartments.    Under the terms of the plan, he became a "holder of unsold shares."    As of June 2, 1990, he remained the holder of unsold shares to 63 apartments.    He controlled the board of the apartment corporation.

81.    Defendant James T. Metz, Jr. filed a post-closing amendment to the offering plan on January 20, 1990.    In his amendment, he claimed a credit for prepayment of town, village and school taxes.    Nevertheless, he had not paid his portion of the taxes due, and the apartment corporation, which he then controlled, did not pay its real property taxes as they became due.

22

## FAILURE TO MEET FINANCIAL OBLIGATIONS

82. As of December 31, 1991, James T. Metz, Jr. owed the Rockville Tudor Apt. Corp. at least $189,000 for real estate taxes, penalties and interest accruing prior to closing in November 1989. He also had not paid any maintenance on his shares in 1989 and 1990 and owed maintenance exceeding $270,000. He still owes the cooperative maintenance, late fees and penalties, as well as the real property taxes apportioned to him at closing.

83. Defendants were all well aware of unpaid taxes and unpaid maintenance and did not tell prospective purchasers or tenant shareholders of the Rockville Tudor Apt. Corp. anything about them for two and a half years, until March 1992.

## MISREPRESENTATIONS REGARDING THE MORTGAGE

84. Defendant James T. Metz, Jr. did not place the same mortgage on the premises at 12 Hempstead Avenue that he had promised in his offering plan when he declared the plan effective in October 1989. Instead of a promised mortgage with the Troy Savings Bank for $1,990,000, Mr. Metz placed a $2,056,536 mortgage on the premises. He falsely stated in his amendment that the mortgage was held by the Bank of New York.

85. In fact, the mortgage was held by a Metz family entity, defendant Harding and Thornton, Inc., and had been used by Mr. Metz as collateral for a loan from a predecessor to the Bank of New York, the Dutchess Savings Bank. The Bank of New York held

23

only a collateral assignment in the mortgage owned by Harding and Thornton.

86.   The shift in mortgage holder to Harding and Thorton, Inc., allowed the defendants to take credit for maintenance payments by deducting mortgage payments to Harding and Thorton. Beginning in 1993, Harding and Thorton, however, failed to make monthly payments to the Bank of New York to repay money it had borrowed using its Rockville Tudor mortgage as collateral.   The Bank of New York perfected its lien on the Harding and Thorton mortgage, purchasing it at auction for the indebtedness the Bank was owed and in Spring 1994 began a foreclosure proceeding against Rockville Tudor Apt. Corp.

87.   The result of defendants' undisclosed mortgage arrangement with themselves was to enable them to claim to have made maintenance payments by falsely taking a credit for mortgage payments and to claim an additional $66,000 with interest not truly owed while forcing the Rockville Tudor into foreclosure.

## THE APPEARANCE OF A SHIFT IN MANAGEMENT

88.   Shortly following closing, defendant James T. Metz, Jr. elected his daughter, defendant Alicia H. Metz, as director and president of the Rockville Tudor Apt. Corp.

89.   Defendant James T. Metz, Jr. designated defendant Bechtoldt Corporation as the managing agent of the apartment corporation.   He and his wife then owned the shares of Bechtoldt Corp.   Later, he transferred at least part of his interest in

24

Bechtoldt to his daughter, Alicia H. Metz.   Defendant Alicia H. Metz became Bechtoldt's president.   Defendant Alicia H. Metz and her sisters, Lauren Simon and Kathryn Metz, also had become directors of the apartment corporation, remaining directors at least through June 1993 and holding three of five board directorships.

90.   Defendant James T. Metz, Jr. filed his last amendment to the offering plan for Rockville Tudor Apt. Corp. on June 26, 1990.   In that amendment, he falsely claimed that he was current in his obligations to the apartment corporation and had been current since title closed in November 1989.   With his amendment, he submitted a form RS-2, dated June 1, 1990, certifying that his offering plan complies with the Martin Act and the Attorney General's regulations.

91. James T. Metz, Jr. also stated in his last amendment that his unsold shares in Rockville Tudor had not been pledged as a collateral security for any loan given to sponsor.   On July 5, 1990, two weeks after filing, he pledged his shares to the Troy Savings Bank for $1.5 million.   This pledge of shares was not subsequently disclosed in any offering plan.

92.   On January 2, 1991, slightly over a year after the closing, when Metz had become the holder of unsold shares, he transferred his interest in the unsold shares to Huntington & Kildare, Inc., a corporation of which his six adult children were and are directors and shareholders.   Huntington & Kildare, Inc. then became the controlling shareholder of the apartment corporation and a holder of unsold shares.   Mr. Metz remained

25

active in the affairs of the cooperative as an employee of Bechtoldt Corporation and a consultant of Huntington and Kildare, Inc.  He remains effectively in control of all the family's business activities.

## ENGAGING IN ILLEGAL SALES ACTIVITY

93.  After defendant Huntington and Kildare, Inc. became the majority shareholder of the apartment corporation, Huntington and Kildare, Inc. and Bechtoldt Corporation, H & K's selling agent, continued to sell shares in the apartment corporation.  Huntington and Kildare and its principals did not file an offering plan, or amend the offering plan of James T. Metz, Jr., to disclose any public offering by them and Bechtoldt.

94.  Defendant Two Lincoln Advisory Services, a wholly owned Metz entity, financed many of the sales by James T. Metz, Jr. and Huntington and Kildare, Inc.  James T. Metz, Jr., Huntington and Kildare, Bechtoldt, Two Lincoln Advisory Services and their officer and directors did not disclose the terms of this financing in an offering plan.

## TAX DEFAULTS

95.  Defendant Huntington & Kildare, Inc. did not pay the apartment corporation the full amounts owed by James T. Metz, Jr. in real estate taxes and maintenance and, itself, has failed to pay maintenance for apartments it holds.  As a result, the cooperative could not meet its expenses, and unpaid real estate taxes, interest

26

and penalties had increased to at least $593,000 by December 31, 1992. By October, 1993, the indebtedness of the apartment corporation for unpaid taxes, interest and penalties  exceeded $827,000. This tax indebtedness continues to grow.

96.    Despite its failure to pay maintenance it owed the apartment corporation, Huntington & Kildare, Inc. paid interest on a $1,075,000 note it purportedly had given to James T. Metz, Jr. The Bechtoldt Corporation paid him a salary.

## UNLAWFUL CONTROL OF BOARD

97.    When Defendant Huntington & Kildare, Inc. became majority shareholder of the apartment corporation, the shares remained subject to a lien in favor of the apartment corporation for the unpaid sums, exceeding $459,000, owed to it by James T. Metz, Jr.

98.    The by-laws of the Rockville Tudor Apt. Corp. provide that the corporation shall have a lien upon the shares of each shareholder for all indebtedness from the shareholder to the corporation and that shareholders are not entitled to vote unless all indebtedness is paid.    Nonetheless, defendant Huntington & Kildare, Inc. continued to vote its shares and elect its directors and officers, the defendants Alicia Metz, Lauren Simon and Kathryn Metz, to a majority of the positions on the board of the apartment corporation through June 7, 1993.

99.    The defendants Alicia Metz, Lauren Metz and Kathryn Metz were never properly elected to the board of Rockville Tudor

27

Apt. Corp. because, although later transferred to the corporate defendant, Huntington & Kildare, Inc., sponsor's shares remained subject to a lien for unpaid tax indebtedness from the apartment corporation's inception.    Under the cooperative's by-laws, this indebtedness precluded defendants from voting.

100.    Without disclosing their failure to do so in an offering plan, defendants did not file a certificate of incorporation for the cooperative containing the voting restriction against indebted shareholders reflected in the cooperative's by-laws and offering plan. Nonetheless, defendants are equitably estopped from denying the voting restriction placed upon their shares by the cooperative's by-laws and their indebtedness.

101.    On June 7, 1993, a shareholders' meeting of the apartment corporation was held for the purpose of electing new directors. As provided by the apartment corporation's by-laws, a majority of the directors elected at the meeting were to be resi- dent shareholders, unrelated to the holder of unsold shares, Huntington & Kildare, Inc.

102.    At the June 7, 1993 meeting, Huntington & Kildare, Inc. voted its interest to re-elect defendants Alicia Metz and Kathryn Metz, and to elect as a third director, a tenant-share- holder named George Muckle. Mr. Muckle had not accepted nomination to be a director and refused to serve as a director. As a result, defendants did not surrender control of the board, but by vote of their majority shareholdings produced instead a deadlocked board of four members, two of whom were the defendants Alicia and Kathryn

28

Metz, the other two being tenant shareholders unrelated to the sponsor. Defendants' action was intended to prevent tenant-shareholders from controlling the board of the apartment corporation and succeeded in this end.

## CONCEALMENT OF THE FINANCIAL CONDITION OF THE COOPERATIVE

103. Defendants James T. Metz, Jr., Bechtoldt Corporation, Huntington and Kildare, Inc. and the officers and directors of Bechtoldt and Huntington and Kildare had absolute control over the affairs of the Rockville Tudor Apt. Corp. from November 1989 through June 1993. They were obligated under by-laws of the cooperative to produce an audit for each year by May 1 of the following year. Defendants never produced a timely financial report for the cooperative during the period of their control.

104. Accountants did not complete an audit of the Rockville Tudor Apt. Corp. for the period November 17, 1989 to December 31, 1990, until December 5, 1991. Defendants did not disclose this audit to tenant shareholders until late March of 1992.

105. Defendants James T. Metz, Jr., Alicia Metz, Lauren Metz Simon, Bechtoldt Corporation, Huntington and Kildare, Inc. and their officers and directors did not order an audit for the year ending December 1991 until June 1992. It was not completed until December 1992.

106. Defendants James T. Metz, Jr., Alicia Metz, Kathryn Metz, Lauren Metz Simon, Bechtoldt Corporation, Huntington and

29

Kild_re, Inc. and their officers and directors never ordered a 1992 financial statement for the cooperative.

107. Defendants James T. Metz, Jr., Huntington and Kildare and its officers and directors were all fully aware of their own failures to pay maintenance and of the resulting defaults in real property taxes. Defendants did not tell prospective purchasers or purchasing tenant shareholders anything about these failures or the resulting tax defaults until March 1992.

**CONCEALMENT OF RECORDS**

108. When the Attorney General subpoenaed bank statements of the apartment corporation, its managing agent, Bechtoldt Corporation and its president, Alicia Metz, submitted incomplete records with missing monthly statements and missing cancelled checks.

109. Tenant shareholder directors unrelated to the sponsor repeatedly requested of defendants Bechtoldt, Huntington and Kildare, Alicia Metz, Lauren Metz Simon, Kathryn Metz and James T. Metz Jr., to see the apartment corporation's books and records, particularly bank statements, but defendants repeatedly refused to allow them access.

110. Defendants James T. Metz, Jr., Alicia Metz, Kathryn Metz, Lauren Metz Simon, Bechtoldt Corporation and Huntington and Kildare, Inc. and their officers and directors repeatedly concealed the deteriorating financial condition of Rockville Tudor Apt. Corp. from the Attorney General, prospective purchasers and tenant-shareholders and continued sales of shares and leases in Rockville

Tudor Apt. Corp. to the unsuspecting public to and from New York State. None of the financial irregularities involving the Rockville Tudor Apt. Corp. were disclosed in any offering plan.

## USE OF COOPERATIVE MONEY FOR PERSONAL EXPENSES AND LOANS

111. Defendant Alicia Metz signed two checks for $11,500 and for $200, drawn on the account of the apartment corporation, to the order of Cobble Pond Farms, the residence of the individual defendants. She also wrote a check drawn on the apartment corporation account to the New York Department of Law for an amendment filing fee owed by James T. Metz, Jr., as sponsor of the offering plan for Rockville Tudor Apt. Corp. and paid defendant Bodner, her father's attorney, by check drawn on the apartment corporation account for legal services he provided to James T. Metz, Jr.

112. On occasions when they have made partial payments of maintenance, defendants James T. Metz, Jr. and Huntington and Kildare, Inc. have not paid the cooperative any interest or penalty for their overdue payments. In the meantime, the cooperative has incurred interest and penalties for unpaid real property taxes which exceeded $128,000 as of January 1992 and which continue to grow. The delays in paying, and refusals to pay, maintenance by defendants James T. Metz, Jr., Huntington and Kildare, Bechtoldt Corporation and their officers and directors represent interest-free loans to themselves at grievous cost to the cooperative.

31

## SELF-DEALING CONTRAL.3

113. Defendants Bechtoldt, Alicia Metz, Lauren Simon and Kathryn Metz, as managing agent and directors of the Rockville Tudor Apt. Corp., also had arranged for defendant Huntington and Kildare, Inc. to supply fuel oil to Rockville Tudor Apt. Corp. This contract paid Huntington and Kildare, Inc. and Peterson Petroleum of New Hampshire approximately $7,500 to $11,500 monthly.

114. Defendants James T. Metz, Jr., Alicia Metz, Kathryn Metz, Lauren Metz Simon, Bechtoldt Corporation, Huntington and Kildare, Inc. and their officers and directors also caused the cooperative to contract with Bechtoldt Corporation to be the cooperative's managing agent. As managing agent of Rockville Tudor Apt. Corp., defendant Bechtoldt and its officers and directors, including its president, defendant Alicia Metz, had the obligation under their contract to bill and collect maintenance charges and rent, among other tasks, for the apartment corporation.

115. Defendant Bechtoldt delayed or failed to pursue collections of the back maintenance owed by defendants Huntington & Kildare, Inc. and James T. Metz, Jr. Defendant Alicia Metz, Bechtoldt's president, refused to pay maintenance on some apartments held by Huntington and Kildare, Inc., of which she was also president. In the meantime, Huntington and Kildare, Inc., paid James T. Metz, Jr. interest for a note he purportedly gave it for $1,075,000, while Bechtoldt Corporation paid him a salary exceeding $75,000 yearly. Despite the cooperative's staggering

32

indebtedness, defendant Alic a H. Metz wrote checks on the account of the cooperative for management fees to Bechtoldt Corporation.

116.    Defendants Alicia Metz, Kathryn Metz, and Lauren Metz Simon did not follow the procedure set forth in Business Corporation Law, or any other law, for the approval of any contracts with the cooperative in which they had an interest or for loans in the form of unpaid maintenance that they took from the cooperative.

**THEFT BY DEFENDANT BODNER**

117.    Defendant Howard Bodner stole at least $218,000 from the Rockville Tudor Apt. Corp. while acting as its attorney and the attorney of several of the defendants and was convicted of his wrongdoing.

118.    Defendant Bodner also assisted in drafting the false and incomplete statements appearing in the offering plans and amended offering plans for both Rockville Tudor and Maplewood Gardens, all of which he submitted to the Attorney General for filing.  He knew that the plans and amendments he was submitting contained false and incomplete statements.

119.  Bodner knowingly participated with the other defendants in the concealment of financial problems of the cooperative and facilitated sales of apartments to the unsuspecting public. He acted as escrow agent and attorney at closings following the illegal sales of apartments by the other defendants.

33

## THE RESULT FOR ROCKVILLE TUDOR

120. All the defendants have acted in concert. Their actions have critically harmed the Rockville Tudor Apt. Corp. The families of at least 31 tenant shareholders face the loss of equity in their homes due to tax and mortgage foreclosures while remaining obligated to repay loans financing their individual purchases.

### DEFENDANTS' SYSTEMATIC FRAUDS

121. Defendants, all of them, have functioned as little more than the alter egos of James T. Metz, Jr., have allowed him to participate in their business affairs and have not exercised independent judgment in overseeing the affairs of the Rockville Tudor Apt. Corp. or Maplewood Gardens Apt. Corp. or of any of the family entities having a role in the affairs of these cooperatives.

122. Defendant James T. Metz, Jr. filed for bankruptcy in March 1993. Prior to filing, he transferred significant assets to defendant Huntington and Kildare. The actions of his children and of the corporate entities the Metz family controlled were a function of James T. Metz Jr.'s bankruptcy planning and represented self-dealing by the Metz family at the expense of the Rockville Tudor Apt. Corp. and Maplewood Gardens Apt. Corp. Defendants have all acted as an integrated enterprise engaged in the systematic defrauding of the public.

123. Defendants' acts and omissions, as alleged above, constitute frauds under the Martin Act and Executive Law, contrary to the interests of the public, the two apartment corporations,

34

Rockville Tudor and Maplewood Gardens, minَ ity shareholders, and purchasers and prospective purchasers from defendants.

124. Defendants' acts and omissions, alleged above, were also breaches of their fiduciary obligations as the majority shareholders, directors, officers, managing and selling agents, sponsors, holders of unsold shares, attorney, and promoters to the Rockville Tudor Apt. Corp. and Maplewood Gardens Apartment Corp., minority shareholders, and to purchasers and prospective purchasers of defendants' shares and leases.

## AS AND FOR A FIRST CAUSE OF ACTION

125. The sponsor-defendants failed to disclose in the offering plan or amendments the mortgage on the Maplewood Gardens premises held by Connecticut National Bank. They failed to disclose in the offering plan the true holder of a mortgage on the Rockville Tudor premises.

126. The existence of the CNB mortgage and the identity of the holder of the Rockville Tudor mortgage are material facts and should have been disclosed in offering plans.

127. Sponsor-defendants' failure to disclose the mortgages violated GBL §§ 352, 352-c, and 352-e, as well as applicable regulations.

## AS AND FOR A SECOND CAUSE OF ACTION

128. As of December 31, 1991, the sponsor of Maplewood Gardens, as mortgagor, had made no payments on the undisclosed CNB

35

mortgage since October 1990, leaving the CNB mortgage seriously in arrears.

129. The sponsor never disclosed the non-payment of the CNB mortgage in any amendments to the plan.

130. By failing to disclose these facts and engaging in sales activity, sponsor-defendants violated GBL §§ 352, 352-c, 352-e and applicable regulations.

**AS AND FOR A THIRD CAUSE OF ACTION**

131. The sponsor-defendants represented in the offering plan for Maplewood Gardens that the sponsor would hold a $1.5 million purchase money mortgage on the premises.

132. The sponsor never held a mortgage on the premises.

133. The sponsor-defendants never disclosed the fact that they did not hold a mortgage and the applicable tax implications, and, in addition, effected and accepted payments of the cooperative's funds as if the mortgage were in place.

134. The sponsor-defendants' failure to disclose the absence of a sponsor-held mortgage constitutes a violation of GBL §§ 352, 352-c, 352-e, and applicable regulations.

**AS AND FOR A FOURTH CAUSE OF ACTION**

135. On September 6, 1989, the closing date for Maplewood Gardens Apartment Corp., the property was encumbered by two mortgages, both of which required the mortgagee's permission for a transfer of title. The sponsor failed to disclose these mortgage

36

terms in the offering plan (and, in fact, did not advise the mortgagees of the proposed transfer or obtain their permission).

136. By failing to disclose these facts and engaging in sales activity, the sponsor-defendants violated GBL §§ 352, 352-c, 352-e and applicable regulations.

## AS AND FOR A FIFTH CAUSE OF ACTION

137. The sponsor-defendants and defendants H & K, Peterson Petroleum and Two Lincoln failed to pay the maintenance on the unsold shares that they held in the Maplewood Gardens and Rockville Tudor apartment corporations.

138. The defendants' failure or inability to pay maintenance is a material fact that must be disclosed by filing amendments to the offering plan with the Department of Law before the defendants or their employees and agents may make or take part in public offerings or sales of unsold units.

139. By failing to disclose these facts and engaging in sales activity, defendants violated GBL §§ 352, 352-c, and 352-e, and applicable regulations.

## AS AND FOR A SIXTH CAUSE OF ACTION

140. At year-end 1989, only four months after Maplewood Gardens Apartment Corp. took title to the premises, the sponsor-defendants owed more than $174,000 in maintenance on the unsold units.

37

141.   In the sixth amendment filed in June 1990, the sponsor-defendants represented that they had met all obligations to Maplewood Gardens Apartment Corp. since title was transferred.

142.   The sponsor-defendants' representations were false and constitute violations of GBL §§ 352, 352-c, and 352-e, and applicable regulations.

## AS AND FOR A SEVENTH CAUSE OF ACTION

143.   At the closing of title to Maplewood Gardens Apt. Corp. and Rockville Tudor Apt. Corp., outstanding back taxes on the property were not paid by the sponsors. The apartment corporations were thus left with an obligation which the offering plan repre-sented the sponsors would pay.

144.   The sponsor-defendants thus failed to comply with the terms of the offering plan in violation of GBL §§ 352, 352-c, 352-e and applicable regulations.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

145.   Sponsor-defendants never disclosed in any post-closing amendment to the offering plan that property taxes for periods prior to the transfer of title to the Maplewood Gardens Apt. Corp. had not been paid and that the first mortgagee invaded the apartment corporation's tax escrow to pay such taxes.

146.   By failing to disclose these facts and engaging in sales activity, sponsor-defendants violated GBL §§ 352, 352-c, 352-e and applicable regulations.

38

## AS AND FOR A NINTH CAUSE OF ACTION

147.  The sponsor-defendants failed to amend the offering plan to disclose the lack of repair of the roof at Maplewood Gardens and the litigation against the sponsor by the roofer.

148.  The continued problems with the roof and the existence of the lawsuit were material and should have been disclosed.

149.  The sponsor-defendants' failure to disclose those facts and litigation violated GBL §§ 352, 352-c, and 352-e, and applicable regulations.

## AS AND FOR A TENTH CAUSE OF ACTION

150.  The sponsor-defendants represented in the offering plan for Rockville Tudor Apt. Corp. that the Troy Savings Bank would hold a $1,990,000 mortgage on the premises.

151.  The sponsor-defendants placed a $2,076,000 mortgage on the premises held by Harding & Thornton, Inc.

152.  Defendant Harding & Thornton, Inc., through its principal, defendant James T. Metz, Jr., knew that the mortgage it was holding was not the mortgage promised in the offering plan for Rockville Tudor Apt. Corp.

153.  The sponsor-defendants' placement of a mortgage in an amount  in excess of their promise with a wholly owned corporation constitutes a violation of GBL §§ 352, 352-c, 352-e, and applicable regulations.

39

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

154. As of October 1993, defendants James T. Metz, Jr. and H & K owed the Rockville Tudor Apt. Corp. in excess of $827,000 in unpaid real property taxes and interest and penalties. These taxes accrued because defendants had not paid their apportioned share of taxes at closing and had not paid maintenance thereafter.

155. In the sixth and last amendment of their offering plan for Rockville Tudor Apt. Corp., defendant James T. Metz, Jr. represented that he had met all obligations to Rockville Tudor Apt. Corp. Neither he nor H & K subsequently filed any amendments disclosing the true financial condition of the apartment corporation to purchasers and prospective purchasers and continued to sell apartments to unsuspecting members of the public to and from New York State.

156. The defendants' representations were false and their subsequent failures of disclosure were omissions of material fact of which they were aware and which they concealed. Their misrepresentations and omissions while selling cooperative interests in realty, constitute violations of GBL §§ 352, 352-c, and 352-e and applicable regulations.

## AS AND FOR A TWELFTH CAUSE OF ACTION

157. Defendants Alicia H. Metz, Bechtoldt Corporation, and Lawrence McGowan were selling agents of cooperative interests in realty in Rockville Tudor and Maplewood Gardens, as well as principals of a holder of unsold shares. These defendants knew or

40

with reasonable effort could have known that both cooperatives had severe financial problems. Nonetheless, they did not disclose any of these problems to purchasers and prospective purchasers under the offering plans they were promoting.

158.   Defendants' conduct violates GBL §§ 352 and 352-c and applicable regulations.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION

159.   Defendant Bechtoldt Corporation, at the direction of defendants Alicia Metz and Lawrence McGowan, was the managing agent of Rockville Tudor and Maplewood Gardens. While the mortgages of these cooperatives were in default and their taxes unpaid, due to the nonpayment of maintenance by the sponsor-defendants and holders of unsold shares, Bechtoldt nonetheless paid itself management fees out of the apartment corporations' accounts.

160.   Defendants' payments of those management fees to themselves constitutes a fraud in violation of GBL §§ 352 and 352-c.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION

161.   Defendants Alicia H. Metz, Lauren Metz Simon, Kathryn Metz, James T. Metz III, Robert Metz, Margaret Metz were directors and officers of Huntington & Kildare and responsible for its conduct in the offer and sale of cooperative apartments at Maplewood Gardens Apt. Corp. and Rockville Tudor, Apt. Corp. and for the deceptions, concealments, frauds, misrepresentations and

41

omissions to disclose, as alleged above, as agents and employees of Huntington and Kildare, Inc.

162.    Their omissions and other misconduct constitute violations of GBL §§ 352, 352-c and 352-e and applicable regulations.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION

163.    Defendant Howard Bodner acted as agent of the other defendants in filing false and incomplete offering statements with the Attorney General which he knew were false or incomplete or with reasonable effort could have ascertained were false or incomplete.

164.    Defendant Bodner's misconduct in filing false statements constitutes violations of GBL §§ 352, 352-c and 352-e.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION

165.    Defendant Howard Bodner acting as agent of the sponsors of a public offering stole money of the Rockville Tudor Apt. Corp.

166.    Defendant Bodner's theft constituted a violation of GBL §§ 352 and 352-c.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION

167.    Defendants Peterson Petroleum of New Hampshire, Inc. and Huntington & Kildare, Inc. received between $7,500 and $11,500 monthly for over four years in self-dealing contracts to supply fuel. These corporations were wholly controlled by the Metz family. The corporations' undisclosed contracts enabled the Metz

42

amily to withdraw money from a financially distressed cooperative during the course of the Metz's public offering of interests in the cooperative.

168.    Defendants Peterson Petroleum and Huntington & Kildare's actions in participating in the siphoning of money from a cooperative constitute violations of GBL §§ 352 and 352-c.

## AS AND FOR A EIGHTEENTH CAUSE OF ACTION

169.    Defendant Two Lincoln Advisory Services, a corporation wholly controlled by the Metz family, facilitated sales of apartments by James T. Metz, Jr., Huntington & Kildare and other entities controlled by the Metz family by providing financing for these sales without disclosing in any offering plan, the terms of such financing and without disclosing materially adverse facts within the knowledge of its principals regarding the financial condition of Rockville Tudor Apt. Corp.

170.    Defendant Two Lincoln Advisory Services' financing activities violate GBL §§ 352 and 352-c.

## AS AND FOR A NINETEENTH CAUSE OF ACTION

171.    Defendant Cobble Hills Farms, Inc. facilitated the frauds of its principals, members of the Metz family, by serving as a depository, as described above, of money the Metzes wrongfully took from the account of the Rockville Tudor Apt. Corp. during the course of their public offering of cooperative interests in Rockville Tudor Apt. Corp.

43

172.  Defendant Cobble Hill Farms, Inc.'s conduct violates GBL §§ 352 and 352-c.

### AS AND FOR A TWENTIETH CAUSE OF ACTION

173.  The defendants' foregoing acts and omissions in disclosure constitute repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transacting of business as prohibited by Executive Law § 63(12).

174.  The plaintiff and the public have been irreparably harmed and have no adequate remedy at law.

WHEREFORE, plaintiff demands judgment against the defendants as follows:

1.  An order permanently enjoining and restraining the defendants, their employees, and assignees from directly or indirectly engaging or attempting to engage in any public offering, sale, negotiation, issue, promotion, exchange or distribution, within or from the State of New York, of any real estate securities issued or to be issued as defined by Article 23-A of the General Business Law;

2.  An order permanently restraining and enjoining the defendants from violating the provisions of Article 23-A of the General Business Law of the State of New York, and from any and all acts in furtherance thereof;

3.  An award of damages and restitution by defendants to the shareholders of the apartment corporations herein, as well as

44

to the apartment corporations themselves, in amounts to be determined by the court;

4. An order deeming satisfied, and of no further effect, the $1.5 million note entered into by defendant Alicia Metz, purportedly on behalf of Maplewood Gardens Apt. Corp., and defendant Maplewood Gardens Realty;

5. An order permanently barring the defendants from participating directly or indirectly in the control and/or management of any cooperative interests in realty, whether a cooperative, condominium or otherwise, for which an offering plan has been filed, or is required to be filed, with the Attorney General;

6. An order awarding costs to plaintiff pursuant to CPLR § 8303(a)(6); and

7. Such other and further relief as the Court deems just.

Dated:  New York, New York
        September 13 , 1994


                              G. OLIVER KOPPELL
                              Attorney General of the
                               State of New York
                              Attorney for Plaintiff
                              120 Broadway
                              New York, New York  10271
                              (212) 416-8174

GARY R. CONNOR
KENNETH E. DEMARIO
HARVEY FELDMEIER
VIVIEN B. SHELANSKI
Assistant Attorneys General
 of Counsel

45

STATE OF NEW YORK   )
               :  SS.:
COUNTY OF NEW YORK  )

        HARVEY FELDMEIER, being duly sworn, deposes and says:

        That he is an Assistant Attorney General in the office of G. OLIVER KOPPELL, Attorney General of the State of New York, and is duly authorized to make this verification.

        That he has read the foregoing complaint and knows the contents thereof; that the same is true to his own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters he believes it to be true.

        The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows:  records and correspondence of plaintiff, conversation with employees of plaintiff and records of defendants subpoenaed by plaintiff.

 

                                          _____
                                          HARVEY FELDMEIER

Sworn to before me this
15th day of September, 1994

_Vivin B. Shelensi_
Assistant Attorney General
of the State of New York

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**WESTBURY DIVISION**
------------------------------------X

RECEIVED
BY MAIL

OCT 1 9 1995

N Y S DEPARTMENT OF LAW
NEW YORK CITY OFFICE

In re:                             :      **Chapter 11**

HUNTINGTON and KILDARE, INC.,      :      **Case No. 894-86928-020**
                                          **(RJH)**
                  Debtor.          :
                                          **ORDER**

------------------------------------X

        The STATE OF NEW YORK and DENNIS C. VACCO, Attorney
General of the State of New York, having given Notice of Motion,
together with supporting affidavit and memordanum of law for an
Order pursuant to Bankruptcy Rules 4001(a)(1) and 9014 to modify,
pursuant to 11 U.S.C. §362(b)(2), the automatic stay issued
pursuant to 11 U.S.C. §362(a), to the extent of permitting the
STATE OF NEW YORK to continue its action against the Debtor in the
Supreme Court of the State of New York, entitled <u>State of New York</u>
<u>v. James T. Metz et al</u>, index number 94/406503, except for the
enforcement of any money judgment for damages or restitution that
may be obtained for New York residents; and

        the debtor, HUNTINGTON and KILDARE, INC., having
submitted no papers in response to the motion of the STATE OF NEW
YORK; and

        a hearing having been had on August 29, 1995 at
which the STATE OF NEW YORK appeared by its attorney, DENNIS C.
VACCO, Attorney General of the State of New York, Harvey Feldmeier,
of counsel, and the debtor appeared by its attorney, SCOTT
MANDELUP, ESQ.; *in opposition to the requested relief*

        NOW, therefore, it is hereby



~~ORDERED that the motion is gran~~i; and its further

ORDERED that, pursuant to 11 U.S.C. § 362(b)(4), the stay imposed under 11 U.S.C. § 362(a)(1) does not apply to the prosecution of the above-referenced action in the Supreme Court of New York, except for the enforcement of any judgment for money damages or restitution of money that may be obtained against the debtor.

Dated at Westbury, New York this
26th day of September , 1995

ROBERT JOHN HALL
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
WESTBURY DIVISION

In re

JAMES T. METZ, a/k/a
JAMES T. METZ, JR.,

Debtor.

Bankr. Case No.
893-81478-20
Chapter 7

**DECISION**

### PRELIMINARY STATEMENT

Before the Court[1] is the motion ("Motion") of The Troy Savings Bank ("Troy") for

a change of venue to this Court of the bankruptcy case of Huntington & Kildare, Inc. ("H

& K"). H & K voluntarily commenced its bankruptcy case in May of 1994 by the filing of

a petition in the United States Bankruptcy Court for the District of Connecticut (Bankr.

Case No. 894-21930).

### LAW AND RELEVANT FACTS

The venue of a case under title 11, United States Code ("Bankruptcy Code") is

governed by sections 1408 through 1412 of title 28, United States Code, and Federal Rule

of Bankruptcy Procedure 1014 ("Bankruptcy Rules"). 28 U.S.C. § § 1408-12 (1994); Fed. R.

Bankr. P. 1014 (1994). Troy's Motion is made in the alternative, pursuant to either

Bankruptcy Rule 1014(a)(1) or 1014(b); the pertinent parts of the Rule provide:

> *Cases Filed in Proper District.* If a petition is filed in a proper district, on
> timely motion of a party in interest, and after hearing on notice to the petitioners,
> the United States trustee, and other entities as directed by the court, the case may
> be transferred to any other district if the court determines that the transfer is in the
> interest of justice or for the convenience of the parties.

---

[1]   The Court has jurisdiction over this case pursuant to sections 1334, 157(a) and 157(b)(1) of title 28,
United States Code ("title 28") and the order of referral of matters to the bankruptcy judges by the United States
District Court for the Eastern District of New York (Weinstein, C.J., 1986). This is a core proceeding pursuant
to section 157(b)(2)(A) of title 28.

. . .

**PROCEDURE WHEN PETITIONS INVOLVING THE SAME DEBTOR OR RELATED DEBTORS ARE FILED IN DIFFERENT COURTS.** If petitions commencing cases under the Code are filed in different districts by or against (1) the same debtor, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, on motion filed in the district in which the petition filed first is pending and after hearing on notice to the petitioners . . . the court may determine in the interest of justice or for the convenience of the parties, the district or districts in which the case or cases should proceed. Except as otherwise ordered by the court in the district in which the petition filed first is pending, the proceedings on the other petitions shall be stayed by the courts in which they have been filed until the determination is made.

Fed. R. Bankr. P. 1014(a)(1), (b) (1994).

We will decide whether the "convenience of the parties" dictates that the Motion

should be granted. The courts customarily employ the following non-exhaustive list of

factors in assessing the convenience of the parties:

The proximity of creditors of every kind to the court;
The proximity of the debtor to the court;
The proximity of witnesses necessary to the administration of the estate;
The location of the assets;
The existence of affiliates of the debtor and the existence of an intertwined relationship between the debtor and the affiliate(s);
The economical and efficient administration of the estate (usually the most important factor);
The relative ease of access to sources of proof;
The availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses;
The enforceability of a judgment if one is obtained;
The relative advantages and obstacles to fair trial;
Local interest in having localized controversies decided in a local forum; and
The likelihood of having trials in the state the law of which will govern the action.

*See, e.g., Commonwealth of Puerto Rico v. Commonwealth Oil Refin. Co. (In re*

*Commonwealth Oil Refin. Co.),* 596 F.2d 1239, 1247 (5th Cir. 1979), *cert. denied,* 444 U.S.

2

1045 (1980); *In re Jolly*, 106 B.R. 299, 300-01 (Bankr. M.D. Fla. 1989); *In re Waits*, 70 B.R. 591, 594-95 (Bankr. S.D.N.Y. 1987); *In re Ofia Realty Corp.*, 74 B.R. 574, 576 (Bankr. S.D.N.Y. 1987); *In re Almeida*, 37 B.R. 186, 188 (Bankr. E.D. Pa. 1984).

Troy stresses that application of the listed factors to the H & K case demonstrates that the case should be transferred to our District for the convenience of the parties. Many of the listed factors were enumerated in Troy's Motion papers. In addition to Troy's papers, H & K's bankruptcy petition also discloses facts which have application to the Motion and the enumerated factors. We will cover some of the applicable and pertinent aspects of the parties' papers, the files before the Court and the prior proceedings.

H & K is a corporation that is wholly owned by Metz's six children. Metz, his family, and certain of the parties involved in H & K's bankruptcy case have been involved in at least six other bankruptcy cases before this Court: *In re Metz*, (893-81478-20), which is Metz's personal bankruptcy case; *In re Bechtold Corp.* (893-85879-20), in which the debtor is a corporation fully owned by Metz's wife and which serves as managing agent for the real properties owned by H & K; *In re Harding & Thornton, Inc.* (893-85878-20), in which the debtor is a corporation of which Metz is the sole shareholder and president; *In re Cobble Pond Farms, Inc.* (891-85529-20), in which the debtor corporation's president is Metz, and its sole shareholders are Metz and his wife; *In re Mitchelltown Apts., Inc.* (891-87460-20), in which the debtor corporation's equity shares are owned 50% by H & K and 25% by Metz; and *In re Kathleen M. Metz* (893-86370-20), the personal bankruptcy case of Metz's wife.

Among the personal property listed as owned by H & K are approximately 260,000 shares of stock in eight cooperative apartment corporations. Six of these eight corporations'

3

real property is located in our District. The shares of stock of these New York corporations are virtually all encumbered by creditors' liens.

All but one of the sixteen creditors holding unsecured priority claims are New York municipal taxing authorities. H & K lists its involvement in eleven separate lawsuits: Three are in our District; not one was filed or is pending in Connecticut. One of the lawsuits in this District is H & K's own action against the present movant, Troy, filed in New York's Nassau County Supreme Court.

H & K owns one parcel of real property located in Connecticut, a residence; however, all other real property is located in New York. The residence is listed in H & K's voluntary bankruptcy petition as having a current market value of $1.5 million. (The bankruptcy petition is dated May 27, 1994). The balance of real property, located in New York, is listed as having an aggregate value of $4,677,600.

H & K is a New York corporation, not licensed to do business in Connecticut. H & K attempts to demean the significance of this fact, stating: "Had Troy checked the governing law it would had [sic] readily observed that the pertinent statutes contain numerous exceptions to the licensure requirement including, but not limited to, ownership of real estate. Therefore lack of a licensure in Connecticut is totally immaterial in this analysis." H & K's Objection ¶ 22. H & K omitted, however, to provide the Court with the "governing law." *Id.*; *see also* H & K's Memorandum of Law at 1 *passim* (no mention of Connecticut law allowing H & K to do business in the state). Query, then, whether an entity that is not licensed to do business in Connecticut may perform any of the acts necessary to achieve a business reorganization in bankruptcy. H & K seems not to be willing to provide

4

the Court with the "pertinent statutes [that] contain numerous exceptions." *Id.* The Court is not at liberty to presume the existence of such Connecticut statutes or, if they exist, their applicability to the business of H & K.

The Court has heard many related issues involving H & K, Metz, his family and their businesses and affiliates. The Eastern District branch of the Office of the United States Trustee has many records and familiarity with these persons and entities. None of H & K's equity security holders intimated any difficulty with the location of this Court during our administration of matters in the six other related bankruptcy cases before this Court.

While H & K argues that the "vast majority of H & K's creditors are located in upstate New York or Connecticut," H & K's Objection ¶ 44, *not one* of these creditors has filed papers or attempted to raise objection in any way to Troy's Motion.

To quite the contrary, many persons and entities have filed papers in support of Troy's Motion. Such parties have detailed the legal and factual bases, and propriety of an order transferring the case to the Eastern District of New York. These parties are: Rockville Tudor Apartment Corporation, a cooperative apartment corporation which is listed as a creditor in the H & K bankruptcy schedules and which filed a proof of a claim against the *Metz* bankruptcy estate for over $800,000, representing unpaid real estate taxes and penalties; Maplewood Gardens Apartment Corp., a cooperative apartment corporation which was listed as a creditor of H & K in its bankruptcy schedules and which alleges a claim of $170,000 against the *Metz* estate; Margaret G. Johnston, Chairperson of the Official Committee of Unsecured Creditors in the prior chapter 11 *Metz* bankruptcy case (recently converted to one under chapter 7 of the Code), who, as executrix of the estate of Frank A.

5

Galli, has filed an action alleging a fraudulent conveyance against H & K in the United States District Court for the Northern District of New York; the Assistant Attorney General in the Real Estate Financing Bureau of the New York State Department of Law, who, by affidavit, informs the Court that the Attorney General of the State of New York intends to commence a securities fraud action against H & K and others; The Bank of New York, which alleges a claim against H & K secured by a mortgage lien; Thomas J. Donnelly and Firstar Trust Co., Trustees of the Ralph Evenrude Revocable Trust of 1981, who allege through their attorney's affirmation that they are judgment creditors of the *Metz* estate and that the H & K estate is the recipient of fraudulent transfers made by Metz and his children; and Kenneth P. Silverman, Esq., the chapter 7 trustee of the *Metz* estate.

It is difficult to regard H & K's argument that our District is not a convenient forum where not one person or entity (other than H & K and Metz) has asked that the case remain in the original forum. No secured or unsecured creditor, no taxing authority, no defendant or party presently involved in litigation with H & K, no present or potential witness, no present or potential lender, *nor even other equity holders of H & K* filed papers in opposition to the Motion, or intimated any desire to be heard.

In fact, Metz's objection to the Motion is itself perplexing. He provides observations regarding whether the H & K case should be transferred. But his own representations detail the lack of relevance of his input: Metz is not a shareholder of H & K (his minority interest was sold "more than three years ago"); Metz is not an officer of H & K; Metz is not a director of H & K; Metz exercises "no control, direct or indirect, over any outstanding voting stock of H & K;" Metz has "no authority, direct or indirect, to control or direct the business

6

affairs and decisions of H & K;" Metz and H & K do not have an alterego relationship; and Metz and H & K are not affiliates. Affidavit of James T. Metz, dated July 25, 1994, ¶¶ 5-12. Metz's successful disassociation with H & K renders utterly immaterial his comments, suggestions and opposition to the Motion regarding the venue of the H & K bankruptcy case. The way Metz prefaces his comments—with a genuine detachment from H & K as a business and corporation—it is a mystery why he holds any interest in the location of the H & K bankruptcy case at all. Metz's standing to opine on the issue is questionable, at best.

To summarize:  Metz affirms under penalty of perjury that he has no legal relationship with H & K or its "business affairs and decisions." *Id.* ¶ 12. Metz thus has irrelevant concern for where H & K's bankruptcy case lies. No other party joined H & K's request that the bankruptcy case remain in Connecticut. Six related cases are before this Court. Seven entities, including Movant, desire an order transferring the case to our District.   H & K declined to demonstrate that it may legally even do business in Connecticut. Allegations abound that the *H & K* estate is the recipient of many fraudulent transfers and will be a defendant in actions by the chapter 7 trustee of the *Metz* estate and other New York entities or persons.

No director, officer, controlling person, shareholder, nor any person with an actual interest in H & K raised any opposition to an order transferring the case to our District. Thus, with Metz having successfully demonstrated a lack of interest or control over H & K, not one interested party opposes the Motion.

The Court need not further address the matter. According to the facts listed, the heavy support for the Motion, and the void of genuine opposition to the Motion, it would

7

be an abuse of this Court's discretion to ignore the convenience of the parties. For these reasons, therefore, Troy's Motion for an order transferring the H & K case from the District of Connecticut to the Eastern District of New York is **GRANTED** in all respects. Troy has until November 4, 1994 to file and give notice of entry of an order by this Court in accordance with the decision herein.

Dated:      Westbury, New York
              October 18, 1994

                                    Robert John Hall,
                                    United States Bankruptcy Judge

8

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                                    ss.:
COUNTY OF NEW YORK)

       PASCUAL NOBLE, being duly sworn, deposes and says that he is a paralegal in the office of the Attorney General of the State of New York, the Attorney for the creditor, State of New York.  On the 12th day of July, 1996, he served the annexed Objection to Motion to Approve Stipulations upon the following named persons:

A. Scott Mandelup, Esq., Pryor and Mandelup, attorneys for Debtor Huntington & Kildare, Inc., 675 Old Country Road, Westbury, NY 11590
Kenneth P. Silverman, Esq., Jaspan, Ginsberg, Schlesinger, Silverman and Hoffman, Chapter 7 Trustee of the Bankruptcy Estate of James T. Metz, Jr., Attn:  Gary F. Herbst, Esq., 300 Garden City Plaza, Garden City, New York 11530

Attorneys, in the within entitled bankruptcy proceeding, by depositing a true and correct copy thereof, properly enclosed in a post-paid wrapper, in a post-office box regularly maintained by the United States Postal Service at 120 Broadway, New York, N.Y. 10271, directed to said persons at the addresses designated by them for that purpose.

                         *Poscual Noble*
                           PASCUAL NOBLE

Sworn to before me this
12th day of July, 1996

*Harvey Feldmeir*

Assistant Attorney General of
 the State of New York